It should not be admitted to probate.

In the matter of the probate of a paper purporting to be the last will and testament of JOHN SPARKS, deceased.

[Filed December 21st, 1901.]

1. The confidential relation existing between a testator and his spiritual, as well as secular, adviser, who was made residuary legatee, is not alone sufficient to raise a presumption of undue influence ; the rule which raises such a presumption in transactions *inter vivos* does not apply to testamentary gifts.

2. Slight circumstances, in addition to such relation, will throw upon the beneficiary the burden of showing that the testator's mind was not unduly influenced.

3. The beneficiary having prepared the memorandum from which the will was drawn was called upon to explain his connection with the execution of the will.

4. Upon the facts disclosed—*Held*, that undue influence was not proved.

On appeal from the Middlesex county orphans court.

*Mr. Abraham V. Schenck,* proctor for the appellant.

*Messrs. McDermott & Fisk,* proctors for the respondents.

REED, VICE-ORDINARY.

John Sparks died on November 10th, 1888, leaving a paper executed in statutory form as a will dated May 17th, 1888.  The

testator left three children, John E. Sparks, Abbie E. Bolen, wife of William Bolen, and Ellen Tyrrell, wife of John Tyrrell. The deceased left property amounting to $5,800, all personalty. By the will $100 is left to each of his three children, $200 in cash and an annuity for life or during her widowhood of $225 is left to his wife, Mary. The will provides that after her death or re-marriage, $1,000 is to be divided between the four children of his son John and $1,000 between the children of his daughter Ellen. Mrs. Bolen, the other daughter, had no children. On the death or re-marriage of his widow $150 is made payable to the institution of the Immaculate Conception for Homeless Children and $150 to St. Mary's Orphan Asylum of New Brunswick. The residue of his property is given to Rev. Peter L. Connolly and he is named as the executor of the will.

Mrs. Bolen filed a *caveat* to the admission of the will to probate, and has taken this appeal from the decree of the orphans court admitting it. The insistence of the appellant is that the will was the product of undue influence exerted upon the deceased by the residuary legatee.

The testator could not read or write. He was a laborer who by industry and economy had accumulated the property mentioned. He was a member of the Roman Catholic church at Perth Amboy, of which church Father Connolly, the residuary legatee, had the cure. The deceased was an old resident of Perth Amboy. Father Connolly came to the church in Perth Amboy in 1871. The deceased was both a member and a trustee of this church. The relations between Mr. Sparks and Father Connolly became very close and confidential. Not only in matters spiritual, but in business and secular affairs, Mr. Sparks was accustomed to consult with and trust in Father Connolly. Mr. Sparks entrusted his money to the keeping of Father Connolly, taking the notes of Father Connolly for the amounts so entrusted, and these notes were left in the possession of Father Connolly because, as the latter says, "he had a safe and the deceased had none."

On December 27th, 1887, Mr. Sparks conveyed all his real estate to Father Connolly for a consideration of $4,300, taking back a mortgage from the grantee for $3,800, payable in ten years, at five per cent. interest. The remainder of the consid-

eration—$500—was counted out in bills to Mr. Sparks at the time of the execution of the deed, but the money was handed back by Mr. Sparks to Father Connolly to keep for him, and Father Connolly's note for the amount was made to Mr. Sparks, which note was also left with Father Connolly to be kept in his safe. This deed was drawn by Judge Paterson at the request of Father Connolly, who, it seems, paid him for his services. Mr. Sparks remained in possession of this property until his death, under an arrangement, as testified to by Father Connolly, that he should do so, and receive the rents for the portions of the same let to tenants, and should credit the rents upon the interest due from Father Connolly to him, and should pay the taxes upon the property. Before and after the execution of the deed the visits of Father Connolly to the house of Mr. Sparks were very frequent, Mr. Sparks, who was not in robust health, frequently sending for him, and during the latter part of his life the visits of Father Connolly became still more frequent. On May 17th, 1888, the will propounded was executed. It was written by Judge Paterson, without consultation with or instructions from the testator, but from a memorandum in the handwriting of Father Connolly. Father Connolly requested him to prepare the will and gave him the memorandum from which the will should be drafted, and told Judge Paterson he would let him know when Mr. Sparks would be ready to execute it. Judge Paterson says that he notified Father Connolly when it was ready, and Father Connolly thereafter called for him, and they together went to Father Connolly's residence, where he found Mr. Doyle, who, with Judge Paterson, witnessed the instrument. He says that he and Mr. Doyle went to the house of Mr. Sparks, where they were admitted by Mrs. Sparks. The will was executed in the presence of Judge Paterson, Mr. Doyle and Mrs. Sparks. The testator made his mark. After the execution of the will the witnesses returned to Father Connolly's, who drove them home, Father Connolly remarking to them, "I wish you to understand that that is not such a will as I would have Mr. Sparks execute." Mr. Doyle and Judge Paterson both say that the will was carefully read to the testator, but no explanation of its terms was asked for by him.

The facts so far stated are such that I think the burden of proof rests upon the residuary legatee to show that the will was not the product of undue influence exercised by him upon the testator.

The legatee stood in a position of confidential adviser of the testator.

The cases cited in support of the appellant's position which state the invalidating effect of a confidential relation most strongly are cases dealing with gifts *inter vivos*.

It is entirely settled that proof that a donee, at the time a gift was made, stood to the donor as his attorney, guardian, parent, or occupied any other position which implied confidence, control or domination over the conduct of the donor, gives rise to a presumption of unfair conduct and throws upon the donee the duty of showing facts which will relieve him of the implication. The cases settling this doctrine are collected in the notes to the leading case of *Huguenin* v. *Baseley, 2 Lead. Cas. Eq.* (*4th ed.*) *1156.* The subject of undue influence in the case of gifts made by a member of a religious sisterhood to the lady superior of the sisterhood was elaborately discussed in the case of *Allcard* v. *Skinner, L. R. 36 Ch. D. 145.* The doctrine as applied to the relation of clergyman and parishioner is strongly stated by Chief-Justice Beasley in *Corrigan* v. *Pironi, 3 Dick. Ch. Rep. 607.* In the leading case of *Huguenin* v. *Baseley, supra,* the spiritual ascendancy obtained by clergymen over a parishioner was put in the class of confidential relations, the abuse of which was a ground for setting aside a voluntary settlement.

Whether the strict rule which applies to transactions *inter vivos* also prevails in cases of testamentary gifts has been the subject of some contrariety of judicial opinion. *27 Am. & Eng. Encycl. L. 508.*

In the case of *Marx* v. *McGlynn, 88 N. Y. 358, 371,* Mr. Justice Earle, for the court of appeals, said: "There are certain cases in which the law indulges in the presumption that undue influence has been used, and those cases are where a patient makes a will in favor of his physician, a client in favor of his lawyer, and a ward in favor of his guardian or any person in favor of his priest or religious adviser; or where other classes

of confidential relationships existed. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law and some proof should be required beside the *factum* of the will before the will can be sustained." *In the matter of the will of Smith, 95 N. Y. 516,* however, it was said that the doctrine that a benefit conferred upon, or advantage given, by the one holding a dominating situation, casts upon the party claiming the benefit or advantage the burden of relieving himself from suspicion thus engendered and of showing, either by direct proof or by circumstances, that the transaction was free from fraud or undue influence, was confined to cases of contract or gifts *inter vivos.* It was held that the fact that the beneficiary was a guardian, attorney or trustee of the decedent, does not alone create a presumption against a testamentary gift.

In *Merrill* v. *Rolston, 5 Redf. 220,* the testatrix had conceived a dislike for an adopted son and made a will giving the bulk of her property to charities and to a clergyman of the Roman Catholic church, of which church she was a member. Two ecclesiastics aided in the preparation of the will, and signed it as witnesses, but took nothing under it. It was held that these facts raised no presumption of undue influence.

In *Figueira* v. *Taafe, 6 Dem. 166,* a testatrix who had declared her intention to disinherit her sisters, and had had independent advice respecting her testamentary act, made a will giving to a priest to the disinhersion of her sisters, which gift was sustained.

In *Parfitt* v. *Lawless, L. R. 2 Perry & D. 462,* which was heard before Lord Penzance, Baron Pigott and Brett, J., it was held that the rules of the courts of equity in dealing with gifts *inter vivos* were not applicable to wills. In that case a Roman Catholic priest had resided with the testatrix and her husband many years as chaplain, and for a part of the time, covering the date of the execution of the will, as confessor. She left him the bulk of her property and named him her executor. There was no evidence that the beneficiary had interfered with the making of the will or procured the gift to himself, or that the testatrix was under his domination in the common affairs

of life. It was held that undue influence should not be inferred from the relation in which the beneficiary stood towards the testatrix, coupled with the gift to him of the property.

And in *Wheeler* v. *Whipple, 17 Stew. Eq. 141,* Chancellor McGill, sitting as ordinary, held that mere confidential relations between the beneficiary and the testator would not raise a presumption against the validity of the gift.

The mere fact, therefore, that the proponent stood towards the testator as a priest to a parishioner, coupled with the fact that he was the residuary legatee, does not create a presumption against the validity of the legacy given by the will, and throw upon him the burden of establishing the absence of undue influence. If, however, these bare facts are combined with other circumstances tending to show imposition, such a presumption arises, and the burden is cast upon the legatee to rebut it. Such is the case if the evidence shows that the testator was of weak mind. *Dale* v. *Dale, 11 Stew. Eq. 274.* So, also, if the legatee selected the witnesses or made an effort to exclude the natural objects of testator's bounty from his society, or to conceal the making of the will, or to conceal the fact that the will had been made. *Wheeler* v. *Whipple, supra.* So, if the will is one which the testator could not make consistently with the claims of duty or affection. *Notes of Huguenin* v. *Baseley, 2 Lead. Cas. Eq. (4th ed.) 1275.* So, if the legatee drew the will, or caused it to be drawn, in his own favor. *Dale's Appeal, 57 Conn. 127. In re Welsh, 1 Redf. 238,* was a case in which a parishioner made his rector his residuary legatee, who was also empowered to name two scholarships in a theological seminary created by the will. The residuary legatee procured the will to be drawn, and superintended its execution. Mr. Surrogate Robertson, in a learned opinion, reviewing the question of undue influence in connection with the existence of confidential relations, held that these facts required an investigation as to the spontaneous character of the testamentary act, and imposed upon the legatee the burden of rebutting the presumption of undue influence.

It seems, therefore, to be settled that the voidability of gifts *inter vivos* and the invalidity of wills upon the ground of undue influence, rest upon different considerations. In the first class

of cases, there arises a *prima facie* presumption of undue influence whenever the donee occupies a confidential relation to the donor. In this class of cases it is essential that the donor shall have the opportunity of receiving advice from an independent competent adviser (*Hall* v. *Otterson, 7 Dick. Ch. Rep. 522, 529; S. C. on appeal, 8 Dick. Ch. Rep. 695*), unless, perhaps, in instances where the gifts are of slight value. Remarks of Lord-Justice Turner in *Rhodes* v. *Bate, L. R. 1 Ch. App. 252,* and Lord-Justice Lindley in *Allcard* v. *Skinner, 36 Ch. Div. 145.*

Within this class are the cases of *Thornton* v. *Ogden, 5 Stew. Eq. 723; Farmer* v. *Farmer, 12 Stew. Eq. 211; Corrigan* v. *Pironi, 3 Dick. Ch. Rep. 607; Hart* v. *Hart, 12 Dick. Ch. Rep. 543,* cited in the brief of the proctor for the appellant.

But in the second class of cases there is no *prima facie* presumption of undue influence merely because the beneficiary stood in a confidential attitude toward the testator. Nor does the fact that the testator did not seek or have independent advice, of itself, raise a presumption of undue influence.

Lord Penzance, in *Parfitt* v. *Lawless, supra,* entered into an elaborate discussion, explanatory of his notion of the reason why courts of equity had laid down a rule concerning gifts more rigid than the probate court had concerning wills. The controlling reason is, I think, because by a gift a man strips himself of that which he can still enjoy and of which he may have need during his life; while by his will he disposes of that which can be of no further use to him. As he is, under ordinary conditions, so much the less likely to do the first than the second, courts subject gifts to the sharper scrutiny. In recurring to the facts in the present case thus far stated, it is to be observed that there is no insistence that the testator was not intellectually in a normal condition. There is no evidence of mental deterioration. But it is uncontradicted that the residuary legatee did advise the testator in all his business affairs and was entrusted with the money of the testator and with the evidence of the indebtedness due from the legatee to the testator, in such a way as to exhibit the most explicit confidence. This, coupled with the fact that the memorandum, from which the will was pre-

pared, was written by Father Connolly, throws upon him the burden of showing that the testator's mind, at the time of the execution of the will, was free from any influence unduly exerted by the proponent.

The absence of any influence which can be regarded as undue must, in the main, of necessity, be proved by the legatee himself. He, in the most explicit terms, denies that he exerted any influence against the interests of the children of the testator. Indeed, he says that he expressed his dissatisfaction at the exclusion of the children from a greater benefit under the will and urged the testator to leave to each of them $500, and told him that if he did not wish to leave the $500 to John, to leave it to his wife.

His testimony concerning his reception of moneys from the testator, and his giving notes for the same, and the deposit of both in his safe, about which no one but the witness seems to have any special information, appears to me to be ingenuous and veracious. The testimony of the legatee, unless contradicted by some other credible testimony, or discredited by its improbability, cannot be arbitrarily disregarded. There is no credible testimony that in any of the business affairs of the testator Father Connolly dominated his judgment so as to compel him to do what he otherwise would not have done. Nor is their credible testimony that Father Connolly, directly or indirectly, used his influence to embitter the testator against his children or grandchildren, nor that he used his influence to prevent the children from visiting their father, or to exclude them from personal interviews with him. Indeed, Mrs. Tyrrell herself testifies that he advised her to visit her father shortly before his death and advised her to get Mrs. Bolen to do the same.

The failure to leave more to his children is explicable in the light of the testimony of a number of witnesses who say that they heard the testator declare that his children had not used him well, and that he would leave them no more than he was compelled to by law, but that he would leave it to his grandchildren.

It appears that Mrs. Bolen was compelled to leave his house in 1876, and did not visit him until just before his death. It

also appears that he had had trouble with Mr. Tyrrell, the husband of his daughter Ellen, concerning a boat which the testator had partly equipped, and in which he supposed he had a one-half interest. When he discovered that Mr. Tyrrell had registered the boat as one in which the testator had only a two-fifth's interest, the latter was offended. Litigation was begun and the matter was settled by Mr. Tyrrell paying him $1,800.

John Sparks, his son, was a man of drinking habits, and the father said he was afraid of John when he was drunk. The father took out a writ of dispossession to eject him from a house of the testator's which he occupied, and also applied for a warrant against him for assault.

These are circumstances to explain why the testator used the expression about his children already stated. In this mood he left only $100 to each of them, and the same feeling probably modified the amount which he left to their children. The coolness between the testator and the families of his children had prevented that closeness of association from which an attachment would have been likely to arise between him and his grandchildren, and be manifested more markedly in his will.

In respect to the portion of the estate left to the charitable institutions and to Father Connolly, it is quite unlikely that they were the outcome of any spiritual domination. The testator was not only a man of obstinate temper, but a man whose obstinacy refused to yield to the wishes and even threats of a former priest of his church. Once, he had made up his mind that he would not pay an assessed rent on a pew which he occupied in his church, and resisted all efforts to compel him to do so. The priest came down from the altar and asked him if he intended to pay the assessment and he refused to yield. Only after the bishop was called upon to intervene and threatened to cut him off from connection with the church did he succumb to the demand. As a friend and adviser, Father Connolly had the right to call the attention of the testator to the merits of the charitable institutions who are the beneficiaries under his will. In connection with the gift to himself, Father Connolly says that Mr. Sparks had insisted upon his taking a memorandum of instructions for the will; that he (Father Con-

nolly) had delayed doing so for the reason that he knew that
the intended terms of the will would be unsatisfactory, but that
on March 8th, 1898, Mr. Sparks told him that he had made up
his mind to give St. Mary's Church $1,000, on behalf of himself
and his dead wife, for a memorial window. Father Connolly
says he then felt under an obligation to do for Mr. Sparks what
he requested. Father Connolly also says that Mr. Sparks stipu-
lated that the former should spend $500 to put a granite railing
around his monument, which monument he had already ordered
in New York. These two sums—$1,000 and $500—would, to
that extent, diminish the residue which would come to Father
Connolly.

In regard to the transfer of the real estate to Father Con-
nolly, it is not now a question whether this transaction, *inter
vivos,* would have been vacated had it been attacked, but whether
it is evidence of such control over the testator in a collateral
matter as to evidence a general domination by the legatee over
the testator, in respect to the affair of the execution of the will.
Now, if Father Connolly is to be believed, it was the testator
who broached the matter of the sale of the real estate, and wished
Father Connolly to buy it or to get a purchaser. He says it was
in the summer of 1886 that he first spoke of it, and that he spoke
of it again in September, 1887. He wished $4,500 for the prop-
erty, but Father Connolly told him, at last, that he would pay
$4,300 for it, at which sum the property was sold. In support of
Father Connolly, it appears that Mr. Sparks did wish to sell and
requested at least one other person to become a purchaser. The
reason for wishing to rid himself of the property in the shape
of real estate and turn it into personalty, was probably that he
desired to avoid the expense of the reparation of the property,
which appears to have fallen into a condition which made them
undesirable for tenants without repairs. I do not think the
transaction between the parties displays any degree of domina-
tion over the mind of the testator. The one feature of the case
which calls for special care in weighing the probability of undue
influence is the financial relations between the legatee and the
testator at the time the will was made. I have already observed
that Father Connolly has given, in my judgment, a veracious

Sparks' Case.

account of the money of the testator that was put in his care and the number and amount of his notes outstanding as evidence of the reception of such moneys. I think, however, that this money had been all, or in part, used by Father Connolly, possibly for church purposes, so that he would have been put to inconvenience if, at Mr. Sparks' death, he had been called upon to repay it. If this is so, the will, as made, relieved him of this inconvenience. I have considered the force of this view, but taking all the testimony together, I have arrived at the conclusion that undue influence is not proved, and that the decree below should be affirmed.