In the matter of the estate of KATHERINE VANCE COLTON, deceased.

[Decided May 29th, 1933.]

The orphans court of Essex county filed the following opinion:

"Katherine Vance Colton, the decedent, died July 19th, 1930, a spinster, at the age of eighty-seven years. She was born with a silver spoon in her mouth, was eccentric, isolated, inexperienced in any business or other competitive undertaking and a stranger to those subtle and faithless practices which too frequently accompany opportunity where large sums of money tempt the trusted. She had had the good fortune to have her business affairs taken in charge and well cared for by her brother, Mr. Charles S. Colton, up to the date of his death, September 23d, 1920.

"After the death of Mr. Charles S. Colton, Mr. Abel I. Culver took charge of her business affairs. Mr. Culver was married to the sister of Charles S. Colton's widow, Mrs. Kate Parker Colton, who was also a second cousin of the decedent as well as her sister-in-law. Mr. Culver was an able and forceful man; by occupation a certified public accountant, a financial adviser and an ardent Wall street stock operator.

"Subsequent to the death of Charles S. Colton, Mr. Culver continued to act as the confidential business agent, adviser and *factotum* of the decedent, Miss K. Vance Colton, until the day of her death. At the time Mr. Culver took charge of

Miss K. Vance Colton's business affairs she was a woman of large means, owning property aggregating some $800,000 to $1,000,000 in value, and enjoying an annual income of some $40,000 to $50,000. She lived in a large and handsome home at 151 Clinton avenue, Newark, in a manner commensurate with her estate.

"Before the death of Charles S. Colton he and his wife lived with decedent, Miss K. Vance Colton, at the Clinton avenue home, but after his death his widow, Mrs. K. Parker Colton, became a member of Mr. Culver's household, making her home with his family at their residence in Montclair, but maintaining at the same time a desultory connection with the home of Miss K. Vance Colton in Clinton avenue, Newark. Mrs. K. Parker Colton had no children and her nearest relative was her sister, Mr. Culver's wife, Mrs. Lizzie Vance Parker Culver.

"Mrs. K. Parker Colton was also a rich woman, probably more so than Miss K. Vance Colton, as, in addition to inheriting through her husband an equal basis of relationship from the same original sources, she was an heir under the Winner estate from which Mrs. Culver received an annual income of $10,000.

"Mr. Abel I. Culver became also Mrs. K. Parker Colton's business agent and *factotum,* assuming the management of her financial affairs.

"Mr. Culver's relations to Miss K. Vance Colton were of the closest, confidential and most potent character. In conversation with one of the witnesses, who wanted to see Miss Colton, to obtain her signature to a deed, he himself described those relations as follows:

" 'I don't think you had better see her because you must bear in mind that she is a very old lady. Sometimes she does things that she doesn't know what she is really doing, and I am managing all of her affairs. You can readily see how peculiar and odd she is when she insists upon driving through the city of Newark in her carriage driven by horses.'

\*        \*        \*        \*        \*        \*        \*

" 'I manage all of her affairs. You better not go to her. She does everything that I ask her to. She doesn't do any-

thing on her own initiative. She does everything that I ask her to, and I am very busy managing her affairs.'

"I am impressed with the idea that his words substantially picture the situation.

"After Culver assumed the control of the business affairs of Mrs. K. Parker Colton and of Miss K. Vance Colton, and on August 9th, 1922, Miss K. Vance Colton made a will, in which she made Mrs. K. Parker Colton and her favorite niece, Caroline West Colton, her principal beneficiaries, and made Abel I. Culver one of her executors, with William I. Cooper as the other. Mr. Cooper was the president of the National State Bank, at which bank Miss Colton kept her account. This will is not the subject of controversy and has been admitted to probate by agreement of all parties to this proceeding subject to two codicils subsequently made, which codicils are the subject of this controversy and against which caveats have been filed.

"This will be followed from time to time by transfers, without consideration, of property of Miss K. Vance Colton to Mrs. K. Parker Colton and by transfers to Culver himself.

"By these transfers and by the disappearance of other property, the whereabouts or disposition of which is unknown or not revealed, Miss Colton during Mr. Culver's stewardship was separated from the ownership of her home, 151 Clinton avenue, and her entire estate, except some $69,000 to $100,000.

"The interest of Culver in these transfers to Mrs. K. Parker Colton is manifest. She was his sister-in-law, his wife being her nearest relative. She was a member of his household, consisting of himself, his wife and his two children; she was a widow, childless and old, and leaned upon him and them for practically everything. He was in control of her property and financial affairs. There could be but one natural outcome of such a situation, namely, that his wife and children would succeed to her property or the major part of it. These hopes were well calculated, for on July 17th, 1928, Mrs. K. Parker Colton made a will leaving six-tenths of her property to Culver's wife, Mrs. Lizzie Vance Parker Culver, and two-tenths to his children, Winthrop Parker Culver and Katherine P.

Culver, appointing Culver sole executor without security 'in any jurisdiction,' and on August 3d, 1929, she died.

"On June 12th, 1924, Miss K. Vance Colton executed a first codicil to her will and coincidentally therewith made the deed of gift to her home in Clinton avenue to Mrs. K. Parker Colton, which has already been mentioned above. The codicil substitutes a bequest of the entire household goods and personal effects to Mrs. K. Parker Colton, instead of the former bequest, under the will, to her and to Miss Caroline West Colton equally. It recites and fortifies the transfer of the Clinton avenue home and revokes the provisions dealing with this property. It also revokes the provision dealing with a cemetery lot.

"At this time Miss Colton was eighty-one years of age, failing in capacity and memory. Sometime previous Culver had called upon the attorney, the scrivener of the codicil and deed, and given instructions as to what the deed should contain and the codicil should provide, and on the occasion of the execution of these documents he brought Miss Colton to the attorney's office, where she executed them. The drafting of the codicil was in such form that its effect could not be grasped by reading it alone and could only be understood by reading it in conjunction with the will.

"No major purpose is revealed, as accomplished by, or as calling for, this codicil save a fortification of the transfer made by the deed of the Clinton avenue property.

"The transfer of this home property, with the transfer of a large number of securities to Mrs. K. Parker Colton, was further fortified by a gift tax report which was prepared by Culver and executed by Miss K. Vance Colton about March 14th, 1925. By this document she reported, for gift taxes, her home and securities, transferred to Mrs. K. Parker Colton, aggregating $361,000 in reported value.

"While the attorney who drew the codicil and the deed to the home property testifies that he explained the papers to her, and although he doubtless believed she understood the whole transaction, subsequent events seem to show that she neither understood the effect of these papers nor the effect of the gift tax report.

"Some three months after the execution of this codicil and deed, and on September 15th, 1924, Miss Colton's favorite niece, Caroline West Colton, died, but no change was attempted in Miss Colton's testamentary dispositions until nearly five years thereafter. On July 26th, 1929, however, the second codicil which is in controversy, purporting to be occasioned by the death of Caroline West Colton, was executed.

"At this time Mrs. K. Parker Colton was on her death bed at her home in Culver's house, having been found three days previously, July 23d, 1929, to be hopelessly afflicted with cerebral thrombosis, her death was imminent and actually occurred seven days later, *i. e.*, on August 3d, 1929.

"The contingency presented by the expected death of Mrs. K. Parker Colton was that under the existing will and codicil of Miss K. Vance Colton, Miss Colton would, if she should die, die intestate as to her residuary estate.

"In the face of this contingency Culver hastened to have a second codicil prepared and executed by Miss K. Vance Colton. He first went to the office of attorneys in Newark, Reed & Reynolds, where the first codicil and deed had been prepared and executed. Mr. Reed was away and Mr. Reynolds stated that he was busy. Without waiting for Mr. Reed's return or until Mr. Reynolds could give him the necessary time, Culver proceeded to Jersey City and there requested Mr. VanWinkle to draw a codicil. This, with some reluctancy, Mr. VanWinkle did. Under the will and first codicil, as then existing, Mrs. K. Parker Colton was the sole surviving residuary legatee, and as these papers were drawn her bequest would have lapsed in case of her death before that of the testatrix, Miss K. Vance Colton. The codicil which Mr. VanWinkle drew was phrased as being occasioned by the death of Caroline West Colton, which as already stated, had occurred about five years before. It re-established Mrs. K. Parker Colton as residuary legatee, but provided that in case of her death before that of testatrix, then the entire residuary estate should go to Culver's wife, Mrs. Lizzie Vance Parker Culver. As the death of Mrs. K. Parker Colton before testatrix was practically certain, being then imminent, this codicil virtually established Lizzie Vance Parker Culver as decedent's

sole residuary legatee. Culver then took this draft of codicil to Miss Colton's home and had her execute it there without any independent advice and before her two maids as subcribing witnesses. This was on July 26th, 1929.

"Eighteen days before the execution of this codicil, viz., on July 8th, 1929, Mr. Culver's facilities of control over Miss K. Vance Colton's property had been increased by an authorization from Miss Colton giving him access to her safe deposit box, and on the 14th and 21st days of November, 1929, after Miss Colton's death, there were transferred on the books of the company from Miss K. Vance Colton to Abel I. Culver eight thousand three hundred and one shares of the stock of the American Insurance Company of the value of some $225,000. No explanation is offered of this transaction.

"On April 30th, 1930, Miss K. Vance Colton executed to Culver a general financial power of attorney which was lodged with Miss Colton's bank, the National State Bank. In the meantime Mrs. K. Parker Colton having died, viz., on August 3d, 1929, leaving Culver her sole executor, this power of attorney consummated Culver's complete control over the properties of both of these two old ladies.

"Under this power he drew a number of checks to his own order; one for $2,500, two for $500, two for $200, one for $300 and one for $750. These checks are unexplained.

"The situation, from the standpoint of Miss K. Vance Colton, was at this date, that she was dependent upon Culver, his wife and their kin, for the occupancy of her home and the means to maintain it. All her property had passed from her except some $69,000 to $100,000 in securities.

"On July 19th, 1930, Miss K. Vance Colton died at eighty-seven years of age.

"The situation which now presented itself, from the standpoint of Culver, was, that he was in control of all the properties of the estates of these ladies without the necessity of accounting to anyone, save the members of his own family, except for certain obstacles, two slight and one which might be serious. The two slight obstacles were the one-tenth interests of his wife's nephews, Theodore Stockley Parker and John Winner Parker, in the estate of Mrs. K. Parker Col-

ton, and the other, the specific legacies in the will of Miss K. Vance Colton which had only to be paid to be disposed of. The obstacle which might be serious was the fact that Mr. William I. Cooper, the president of the National State Bank of Newark, was a co-executor under the will of Miss K. Vance Colton. Mr. Cooper might be curious about these transfers, especially the ones to Culver. This difficulty might readily have been cared for in the last codicil but could have been easily overlooked in the hurry with which that paper was prepared and executed.

"Upon the death of Miss Colton, Mr. Culver, learning that Mr. Cooper was in Atlantic City, promptly went there to see him and endeavored to induce him not to act as executor. Mr. Cooper testified that Culver said he would make it desirable for him not to serve, which Mr. Cooper, testifying with some show of indignation, said he declined to consider. On returning home, Mr. Culver wrote Mr. Cooper renewing his efforts, picturing a situation of difficulty, threatening that he would refuse to serve if Cooper served, stating that his relations with Miss Colton were highly confidential and that he was considering transferring some of Mrs. Culver's accounts to Cooper's bank.

"Since the death of Miss Colton the maids who witnessed the last codicil, as well as the other servants of Miss Colton, have subsidized, their wages having been continued and paid by Mr. or Mrs. Culver up to and during the trial.

"Both Mr. Culver and Mr. Cooper are now dead, Mr. Culver having died before the trial opened and Mr. Cooper since that time.

"After the transfer of the Clinton avenue home the taxes thereon were paid direct to the city by checks drawn by Mrs. K. Parker Colton and checks were drawn by her to the order of Miss K. Vance Colton for the income on the securities which had been transferred to her. These income checks were placed to the credit of Miss Colton by stamped endorsements. None of these checks bears Miss Colton's signature endorsed thereon. As Culver was in complete charge of the handling of her affairs there is nothing to indicate that she knew how these taxes were paid or whether she paid them or anything

about any of these checks. As far as she was concerned, she continued living in her house and spending her income the same as she had always done.

"I do not doubt that Miss Colton, though weakened in body and mind by age and disease, still had the mental capacity to understand the effects of deeds, codicils, transfers of properties and securities, and of gift tax reports of the same, had it been the will of Mr. Culver for her to do so. But the evidence of subsequent events shows that she had no idea she had ever transferred her home or made a codicil ratifying such transfer, or made a gift tax report thereof. Despite these occurrences she informed a tax department representative that she was the owner of the property. Though pestered by real estate men to sell it she never replied that she was not the owner but stated that she refused to sell and to relatives and friends she repeatedly affirmed she would not part with her home, and she manifested an unusual interest in and attachment to it—indeed, her interests were almost confined to it.

"Under these transfers Miss Colton had reduced herself to a condition of dependence, in so far as maintaining her home and scale of living was concerned, yet in the many rather long and detailed recitals of conversations with her by relatives and friends no suggestion of any such condition is revealed by her, and they of course had no suspicion of it.

"Counsel for proponent urge that the court must close its eyes to the evidence connected with the transfers of the home and securities as this court has no jurisdiction to set these transfers aside. If such a proposition were true then indeed would justice be blind in a new sense. These instrumentalities were all channels to the same end, as were the codicils. A trusted servant with power who will abuse his trust by one means will do so by another when occasion urges and opportunity offers.

"The evidence does not furnish even a suggestion of what Culver told Miss Colton on the various occasions when she signed away her securities. The only occasion, as to which we have testimony, is the one when she transferred her home and fortified the transfer with a codicil reciting it. As to this

occasion the evidence as a whole shows she did not understand what she had done.

"No adequate motive has been, or in my opinion can be, suggested from the evidence, why Miss K. Vance Colton should transfer her home, and substantially all her property, to Mrs. K. Parker Colton and to Culver, leaving herself dependent upon them to maintain her home and accustomed scale of living. Mrs. Colton was not of Miss Colton's blood save distantly, she was a widow, old, rich and childless, while Culver was apparently an able and prosperous business man. Was this situation the product of Miss Colton's mind and the fulfillment of her desires as the proponents contend?

"The absence of any satisfying motive for Miss Colton to put herself in a position of dependence upon others to maintain her home and accustomed scale of living and the presence of the manifest fact that she did not comprehend what she had done, are salient circumstances in the case. The evidence is purely circumstantial; it must be viewed as a whole; all the transfers, facts and circumstances must be considered. I can reconcile them with but one reasonable hypothesis. That is, that the deed, the two codicils, the transfers, the powers of attorney and the gift tax proceedings were the successful produce and fulfillment of a fraudulent and overreaching scheme of Culver's to benefit and unjustly enrich his family and latterly himself.

"For these reasons probate of both codicils will be denied on the ground of fraud and undue influence."

*Messrs. McCarter & English* and *Mr. Francis Child,* for the caveatrix.

*Messrs. Reed & Reynolds, Mr. Marshall VanWinkle* and *Mr. Andrew J. Steelman,* for the respondents.

BACKES, VICE-ORDINARY.

The reaction to this finding of facts is to affirm the conclusions as a whole. But more is needed to condemn the first codicil as the dead Culver's corrupt impositions upon the old lady's testamentary disposition than an appraisal of his char-

acter as evil and his motives as sinister; more is required than an inference of fraud deduced from a state of facts susceptible as well of an implication of innocence. There is no direct evidence of undue influence and the established circumstances do not warrant the conclusion that this codicil is the product of undue influence.

The testatrix' eighty-seven years suggests infirmity. But she was tolerably well of body, and age had not observably diminished her mental faculties. Even the caveatrix concedes that she was a woman of strong determination, strong will, well poised and a very remarkable woman for her age up to the time of her last sickness. That began six years after the first codicil and the year following the second. And she was not eccentric, unless it be found in holding on to her coach and dobbins. Some men still wear boots.

Undue influence is imputed to Culver, an accountant, principally because, when he became the friendly adviser and confidant of the testatrix, in 1922, she was possessed of upwards of $750,000, and at her death, seven years later, had only, approximately $100,000; nearly a half million dollars had passed to her sister-in-law six years before, and $125,000 in securities found their way into the hands of Culver after the second codicil. And the court's concept of Culver, that he was crafty and unscrupulous and false to the testatrix, played no small part. The record, however, fails of proof that the transfers to the sister-in-law were not the voluntary acts of the testatrix, and the bald facts do not reflect that the first codicil was not the spontaneous testamentary design of the deceased. What moved the testatrix to give away the bulk of her estate to her sister-in-law in 1924, is closed to discovery —all the parties are dead. But even surmise, that it was not knowingly and willingly given is not justifiable, for not only did she attest the several transfers, but later verified one of the gifts, $361,000, by a gift tax return to the United States government, paid the tax, $10,000, *plus,* and made note of the transfer of her home, part of the gift, in the first codicil. The deed to the home and the first codicil were drawn by Mr. Reed, her counsel, counsel of excellent standing at the bar, who, two years before, had drawn her will and who testi-

fied she read the documents, apparently, understandingly. As the donee, the sister-in-law was also the residuary beneficiary under the will. The gifts have the appearance of a death tax evasion scheme, gifts in contemplation of death, with a string to them perhaps, for, afterwards, the testatrix occupied the home and had the income from the transferred securities until her death. But whatever the purpose, and though Culver advised, it is sheer conjecture that the deceased, who unquestionably had intelligence and comprehension, was not fully informed and freely participated, knowing the consequences; and welding these incidents as links in a chain of subtle influence by Culver, culminating in the making of the second codicil five years later, is but added speculation. There is no ground whatever, in fact or in law, for refusing probate to the first codicil. It will be probated.

We pass through the next five years without incident other than Culver was attentive upon the testatrix as her counsel and adviser. In July, 1929, the sister-in-law was critically ill, and the second codicil was executed, in which Culver's wife, sister of the sister-in-law, was made the alternate residuary beneficiary. Culver called upon Mr. Reed to have him draw the codicil, and finding him on vacation, had another lawyer, Mr. VanWinkle, prepare it, to whom he gave the instructions. The next morning it was executed, published and witnessed, statutorily, under Culver's supervision, two maids of the testatrix' household acting as witnesses. They testify to the testatrix' mental alertness; that Culver and the testatrix were together quite a spell before they were called in, and that she announced to them it was a codicil to her will and that she wished them to witness it. Whether she read the instrument or had it read to her, or that it was misread, is buried. Culver is dead.

We come then to the remaining episode which, it is felt, more than anything else, arouses suspicion. The testatrix was stricken in April, 1930, the year following the execution of the second codicil. By that time Culver had entree to her strong box. In May he had in his possession, endorsed to his order by the testatrix, under date of the previous November, and witnessed by his clerk who says she never saw the testa-

trix, insurance stocks of the value of upwards of $125,000, which he caused to be transferred to his name on the books of the insurance company. He also had power of attorney of her bank account from which he drew, from time to time, $7,000 and more. Whether he appropriated the cash or spent it for the use of the testatrix during her last illness, we have no means of knowing, nor have we, that the stocks were surreptitiously obtained or given or borrowed. This may be the explanation: Culver gambled heavily in the stock market. In 1929 the devotees of that pastime were in the dreamland of prosperity; stakes ran high, every one was making money —on paper. The crash came in October and stocks tumbled and Culver, like the rest, in all probability, needed funds to bolster his margin accounts. The crash was looked upon as a flurry, not the prelude to the debacle that followed. The downward course was checked and for a while there was a spurt, doubtless due to bolstering the market by those who would not see and kept on playing with every available resource. Was Culver tempted? Did he deceive to get, or did he persuade the testatrix to help in the emergency? The unworthy possession of the securities may account for Culver's efforts to persuade his co-executor, Cooper, not to take office. Who can tell? Either method was pernicious and equity would relieve on a bill to set aside for fraud, actual or constructive, but that is not the issue and it should not blind us, though it may guide us in our inquiry whether the last codicil expresses what the testatrix intended, expressed months before the occurrence that cast the cloud. That is our whole concern—to uphold the testament if satisfied that it is her will, not the will of another. The related circumstances, procurement of the will by the principal beneficiary added to the fact that he stood in confidential relation to the testatrix, according to the doctrine of *Sparks Case, 63 N. J. Eq. 242; 51 Atl. Rep. 118; Cooper's Will, 75 N. J. Eq. 177; 111 Atl. Rep. 26;* followed in *Morrisey's Will, 91 N. J. Eq. 480; 71 Atl. Rep. 676,* raise a presumption of undue influence calling upon the beneficiary to dispel it by evidence satisfactorily explaining his conduct. Baron Parke, in *Barry* v. *Butlin, 6 Eng. Eccl. 417,* said the drawing of a will by one

substantially benefiting by it when coupled with other evidence of fraud or imposition is of very great weight but "in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court in investigating the case and calling upon it not to grant probate without a full and entire satisfaction that the instrument expresses the real intention of the decedent." This excerpt quoted by Vice-Chancellor Van Fleet in *Bennett* v. *Bennett, 50 N. J. Eq. 439; 26 Atl. Rep. 573,* was declared by him to be the established law of the state, and he cited *Rusling* v. *Rusling, 36 N. J. Eq. 603,* where our court of errors and appeals said that "other concomitants might readily be suggested which would give to the fact that the favored party had drafted the instrument almost irresistible force as evidence that the alleged testament was not the will of the decedent," and that the drawing of a will by a favored legatee was a matter which should excite suspicious scrutiny but standing alone the suspicion should be laid aside. In *Ward* v. *Harrison, 97 N. J. Eq. 309; 127 Atl. Rep. 691,* the court of errors and appeals reminds us that "the courts of this state have not gone to the extent to hold that one actively participating in the drawing of a will and who is the chief beneficiary thereunder is presumptively chargeable with undue influence. Such a circumstance may or may not be a factor to establish imposition upon the testator, for that is what is meant by the charge of undue influence, and hence, whether or not there was imposition, must be disclosed by other circumstances and conditions than the mere drafting of a will and being a beneficiary thereunder." And no presumption of undue influence arises from the mere fact that the chief beneficiary stands in a confidential relation to the testator. *Wheeler* v. *Whipple, 44 N. J. Eq. 141; 14 Atl. Rep. 275.* A contrary expression in the opinion of this court prompted the court of errors and appeals in *In re Tunison's Will, 93 Atl. Rep. 1087,* to remark, "we are content to adopt that opinion, with one exception, viz., that, although the testimony in the cause forces the conclusion that Clarence was the confidential agent and adviser of his mother, that fact did not cast upon him the burden of proving that there was no undue influence

exerted by him." Where, however, the beneficiary is confidential adviser to the decedent and also draws or procures the drawing of his will, the combined circumstances raise a presumption of undue influence calling for a complete vindication of the beneficiary's conduct. The rule that the coupled circumstances give rise to a presumption of undue influence, is essentially a rule of evidence for the better ascertainment of the truth in the satisfactory determination of the ultimate resolution "that the instrument expresses the real intention of the decedent" and its exercise finds expression in all the cases presenting the dual status of beneficiaries. In *Bennett* v. *Bennett, supra,* the chief beneficiary, the attorney and confidant of the testator, drew the will. Vice-Chancellor Van Fleet admitted the will to probate upon being satisfied from all the proof in the case that it expressed the untrammeled wishes of the maker. In *Waddington* v. *Buzby, 45 N. J. Eq. 173,* the will was drawn by the husband of the residuary beneficiary who, for a short time, was also the business agent and adviser of the aged, blind and nearly helpless testatrix. The court of errors and appeals had his explanation and was satisfied and held that his conduct, his character and relationship to her did not warrant the charges of fraudulent contrivance and undue influence without more direct and certain testimony. In *Cooper's Will, supra,* where the counsel and a beneficiary of the testatrix drew the will, satisfying proof moved the court to grant probate. In *In re Gaddis, 96 N. J. Eq. 668; 126 Atl. Rep. 287,* the court of errors and appeals held that mistress-beneficiary did not imply that she occupied the dominant position, shifting the burden upon her to prove the absence of undue influence, but the case is a recognition of the doctrine that having the opportunity to impose coupled with a procurement by her of the will, an explanation would be the order.

Here, though, we are confronted with death foreclosing Culver's version of the making of the codicil, nevertheless, we must look to the proofs in the case to determine, if we can, that the instrument was of the free agency of the deceased. In the maze, born of incrimination so common to struggles over the leavings of the dead, we must be ever mindful that our duty to the departed is to maintain their solemnly authen-

ticated testament, and not suffer it to be defeated unless vitiated by the superimposed will of another. There is, of course, no evidence that Culver was not obeying the instructions of the testatrix in effecting the change of residuary beneficiary; and that the change was covertly accomplished, finds some discredit in his going to Mr. Reed, who had drawn the will and the first codicil, to prepare the second codicil. Nor is there any evidence of pressure or even of persuasion. During the five years, from the time of the gifts to the sister-in-law to the making of the second codicil, there is nothing in proof other than of friendly intercourse. There was no general dependency; that testatrix was mistress of her own household. Culver was a daily visitor, and she consulted with him and he advised her and looked after her financial affairs. She had confidence in him and was grateful for his attentions, often expressed.

Testamentary inclinations of many years to leave the estate to strangers in blood is displayed in successive wills. The substitution of Culver's wife in the place of the dying sister-in-law was not out of harmony with the testatrix' clearly indicated plan not to bestow upon the caveatrix and those of her class of relations, any part of her residuary estate. In previous wills she consistently bequeathed to them small pecuniary legacies, the residue going by successive wills to her sister, her brother, the Home for Aged Women, and lastly to the sister-in-law, by the will admitted to probate. To finally give it to the latter's sister marks no departure from her predisposition.

But it is the black page that shakes to the foundation whatever faith would otherwise be entertained in the codicil as the free expression of the testatrix' intentions. Within four months after the codicil, as we have seen, Culver had her stocks to which he had his clerk forge her name as witness to the testatrix' signature. Whether he deceived the old lady into signing, or she gave or lent them is material only in degree; the consequences are the same. If he deceived her he was a rogue and the codicil did not escape his propensity. If he borrowed the stocks it was a wicked imposition and in its magnitude, a small fortune given or lent for the asking,

finds reasonable explanation only in a confidence incapable of resisting an all-powerful influence. If this old lady of determination, strong of will and well poised could be induced to part with this huge sum, it gives a fair measure of Culver's extraordinary persuasive powers at the preparation and execution of the codicil, superintended by him, and of which so little is known except formality and self-advantage.

I am not satisfied that the codicil expresses the real intention of the testatrix. The decree of the orphans court denying probate will be affirmed.