WARREN COUNTY ORPHANS COURT.

IN THE MATTER OF THE ESTATE OF EDWARD NIXON, DECEASED.

Submitted March 17, 1943—Decided March 24, 1943.

Proctors for the appellant, William Nixon, *Lewis S. Beers* and *William P. Tallman.*

Proctors for the executor and respondent, Francis L. Thompson and for Jeanne Lommason, legatee, *Ryman Herr* and *Wesley L. Lance.*

Proctors for Delilah Aagaard and Harriet Little, legatees, *Wilbur M. Rush* and *W. Reading Gebhardt.*

Proctor for Carrie M. Nixon, guardian *ad litem* of Joseph Nixon, residuary legatee, *Claude E. Cook.*

For Grace Nixon, legatee, and for Grace Nixon, administratrix of the estate of Donald L. Nixon, deceased, *Thomas Kelly, Jr.*

Proctor for the surrogate as guardian *ad litem* of Donald Nixon, Grace Helen Nixon and Charles Nixon, minor children of Grace Nixon, and proctor for William Nixon, in military service, *Andrew Varga, Jr.*

ROSECRANS, C. P. J. This is an appeal from probate in common form of a purported will of Edward Nixon, deceased.

The contention of the appellant is that the will was the product of undue influence or fraud exerted upon the decedent by his attorney, Francis L. Thompson, and the appellant challenges the "very existence" of the document as a will.

This paper-writing is dated August 22d, 1942. The testator, Edward Nixon, died on November 6th, 1942, approximately two and one-half months later. He was about seventy years of age. He could neither read nor write, but could sign his name. He left him surviving as his only heirs-at-law and next of kin two half sisters and a half brother, William Nixon, who was not mentioned in the will and who takes this appeal. The value of the estate is estimated to be approximately $50,000. The will provides the following specific legacies:

| | |
|---|---|
| Roy Beers, a nephew | $500 |
| Joseph Nixon, a nephew | 1,500 |
| Jeanne Lommason, secretary of Mr. Thompson, for "many favors and courtesies" | 750 |
| Francis L. Thompson, described as "Attorney at Law of New Jersey, my most reliable and trusted friend" | 2,500 |
| Harriet Little, a half sister | 3,000 |
| Lila Aagaard, a half sister | 3,000 |

The attorney, Francis L. Thompson, was appointed sole executor.

Mr. Thompson was the deceased's attorney from the time he began the practice of law in 1934. He was confidential adviser to the testator; he drafted the will which was typed in his office, by his secretary, Jeanne Lommason, a legatee; he procured the witnesses, one of whom was his mother and the other a client; he was a beneficiary and retained the will in his custody until after the testator's death.

Under these circumstances "it is clear that a presumption of undue influence has been raised, and that the burden of overcoming the presumption and proving that the will was a spontaneous act of the testator was thrown upon" Mr. Thompson. *In re Bartles, 127 N. J. Eq. 472; 13 Atl. Rep. (2d) 642; In re Smalley, 124 N. J. Eq. 461; 2 Atl. Rep. (2d) 321; *126 N. J. Eq. 217; 8 Atl. Rep. (2d) 296; In re

*Romaine,* 113 *N. J. Eq.* 477; 167 *Atl. Rep.* 683; *115 *N. J. Eq.* 172; 170 *Atl. Rep.* 16; *In re Colton,* 11 *N. J. Mis. R.* 410; 166 *Atl. Rep.* 521; *115 *N. J. Eq.* 327; 170 *Atl. Rep.* 610; *In re Cooper's Will,* 75 *N. J. Eq.* 117; 71 *Atl. Rep.* 676; *76 *N. J. Eq.* 614; 75 *Atl. Rep.* 1100; *In re Sparks' Case,* 63 *N. J. Eq.* 242; 51 *Atl. Rep.* 118; *Kocher's, N. J. Probate Law* 162, &c.; *Waltzinger's, N. J. Probate Practice* 305, &c.; *Clapp's, Wills and Administration in N. J.,* § 34.

This presumption may be overcome by testimony which "must be impeccable and convincing," *In re Morrisey's Will,* 91 *N. J. Eq.* 480; 111 *Atl. Rep.* 26; and calls "for a complete vindication of the beneficiary's conduct" so that the court may be satisfied from all the evidence that the will "expresses the untrammeled wishes of the maker," *In re Colton, supra.* The testimony must be credible and convincing, *In re Neuman,* 132 *N. J. Eq.* 7; 26 *Atl. Rep.* (2d) 499. Upon such a presumption arising there is presented "a matter which excites the judicial mind to suspicious scrutiny," *Rusling* v. *Rusling,* 36 *N. J. Eq.* 603. The charge of "undue influence embraces fraud" and considerable reliance must be placed upon inferences from the proofs, and the decision depends "in each case very much on the special facts and surroundings which that case presents." *Lynch* v. *Clements,* 24 *N. J. Eq.* 431.

With the foregoing rules of law as a guide, the examination of the evidence is approached.

Francis L. Thompson is an attorney-at-law with offices at Phillipsburg and Hackettstown in Warren County. Edward Nixon, the deceased, lived all his life near Phillipsburg. Thompson was acquainted with Nixon before being admitted to the bar and he testified that he had acted as his attorney and adviser in numerous matters over the years. In the year 1940 Thompson had drawn a will for Nixon, and this will had been placed by the testator after execution in a safe deposit box which he maintained in the Phillipsburg Trust Co., where it was found when the box was opened after his death. This will left nothing to Thompson nor to his secretary. Thompson states that he drew another will for Nixon in 1941 which Nixon later tore up. Thompson testified that

Nixon came to his Phillipsburg law office at about 11:45 on Saturday morning, August 22d, 1942, and asked Thompson to draw a will for him. Thompson called Miss Jeanne Lommason, his secretary and stenographer, to his inner office and dictated briefly the principal clauses of the proposed will. Thompson said that he used no form book while dictating and had no copies of Nixon's previous wills for reference. Miss Lommason produced a 1942 diary of Mr. Thompson's which was habitually kept on his desk for his use. This diary contained penciled shorthand notes on several pages which Miss Lommason read in evidence. These notes did not represent the complete will but only parts of some of the clauses. Miss Lommason testified that from her experience she was able to satisfactorily complete the will. No corrections were necessary. Her only legal experience at that time had been a year and a half in Mr. Thompson's office since graduating from high school. She stated that although she had typed quite a number of other wills during this time that this was the only one in which she had used Mr. Thompson's diary in taking her notes. On all other occasions her regular stenographer's notebook had been used. She also testified that the "favors and courtesies" which she had rendered the deceased were only such as arose in the conduct of the office and the client's business.

While Miss Lommason was typing the will, Mrs. Laura Thompson, mother of the attorney, came to her son's office on a trifling personal errand. During this time there also came to the office one Alden Carpenter, of Hackettstown, a client of Thompson's. These two were the subscribing witnesses. Another visitor during this period was Owen Jones, of Belvidere, also a client of Thompson's, a social friend and former neighbor. It was testified that these three persons came to the office somewhere between 2:00 and 2:30 P. M. Thompson did not confer with them because he was busy in his private office. When Miss Lommason completed the typing of the will, she placed it on her desk in the outer office and left for the day. At about 3:30 P. M. Thompson came from his private office and greeted the aforementioned people who were assembled in the outer office together with Edward

Nixon. Thompson testified that he was preparing to read the will to Nixon when someone knocked at the door. He excused himself to talk with another client, suggesting that Carpenter read the will to Nixon. Upon Carpenter's refusal to do so, Thompson asked his mother but she also refused. He then requested Jones to read the will which Jones did. The reading took place in Thompson's private office but Thompson was not in the room. Thompson, on cross-examination, stated that he was unaware at the time that Nixon could neither read nor write. Why it then seemed necessary for someone to read the will to Nixon was not explained. Upon conclusion of the reading, Thompson reappeared and asked Nixon if the will was satisfactory and upon receiving an affirmative answer, it was executed. It was about four o'clock when Nixon left the office, followed shortly thereafter by the others. Thompson testified with regard to his legacy that he supposed that Nixon desired to leave something to him in appreciation of his efforts in doing a hundred and one legal tasks for which he had never charged. Thompson said that Nixon wanted to leave something to Miss Lommason because she was "a nice girl." He also stated that he had been indebted to Nixon in the past in the amount of $2,500 and that he still owed $1,600 on another loan from Nixon.

Examination of the will shows that the pages are not numbered nor are they individually initialed or signed by the testator as is commonly done.

On motion of the appellant, the subscribing witnesses were excluded from the court room and were examined out of the hearing of each other and of the other witnesses. The similarity in the testimony of those present at the execution of the will is surprising. Each stated that there had been no discussion of the case nor of their proposed testimony among one another nor with Mr. Thompson nor with anyone else. On Thompson's being recalled after they had testified, he said he had not discussed the case in particular with them but only in a general way, advising them that they would be called. It was, however, later brought out that the witnesses were examined on the day of the hearing by Thompson and

his counsel. The witness, Carpenter, said he did not telephone Thompson's office for an appointment but just dropped in. This contradicted the specific statements of both Mr. Thompson and Miss Lommason that he had telephone on Friday or Saturday for an appointment. The witnesses had each remembered every detail, even to the knock on the inner office door which caused Thompson to leave the room during the reading of the will.

Thompson testified that he did not retain a copy of the 1940 will which was found in the safe deposit box, nor of the 1941 will which had been destroyed. An examination of the two *existing* documents discloses a marked resemblance between them, with the cardinal exception that no bequests were made to Thompson or his secretary in the earlier will. Aside from the similarity in the shorter and more simple paragraphs, it appears that the second paragraph of the 1942 document is exactly the same in wording and punctuation, as the 1940 will. It reads:

"Second—I give and bequeath unto Roy Beers, son of Flora Beers, deceased, the sum of Five Hundred Dollars ($500.00) to him, his heirs and assigns forever; with this proviso, in the event the said Roy Beers should predecease me, then in that event, I order and direct that the aforesaid sum of Five Hundred Dollars ($500.00) is to become a part of the *corpus* and residue of my estate."

Miss Lommason reading her shorthand notes from the diary said that Mr. Thompson had only dictated:

"Roy Beers, son of Flora Beers $500. If he dies it becomes a part of the *corpus* of the estate."

The legal phrasing and composition of the paragraph were hers. The tenth paragraph of the 1942 document bears a striking resemblance to paragraph five of the earlier will. This paragraph contains sixteen lines and sets up a life estate with a remainder over. The eleventh paragraph of the 1942 will consists of ten lines and provides a prohibition against contest by the beneficiaries. It is practically identical, word for word and in punctuation, with paragraph six of the 1940 will. The twelfth paragraph of the 1942 document consists of seven lines and provides for the executor's powers, and the

last paragraph of five .lines, appoints the executor with a direction that no bond shall be required, &c. These latter paragraphs are exactly the same as in the earlier will except that Thompson's name is substituted as executor in the 1942 instrument. Thompson's testimony that in drafting the document under examination he did not have the benefit of referring to copies of the former wills nor to a form book, would indicate an unusual memory. It is difficult to comprehend how his secretary, Miss Lommason, could have composed and typed so similar a document when she did not have a copy of the earlier will and when according to her testimony Thompson did not even dictate all the clauses but only referred to some of them sketchily, leaving much of the phrasing to her. She had no knowledge of how the 1940 will was worded or punctuated because she was not employed in Thompson's office when it was prepared. She testified that she did not know of it.

The appellant also produced a number of friends and intimates of the deceased who testified to the effect that after the execution of the 1940 will to the day before his death on November 6th, 1942, Nixon had told them that his will was in his safe deposit box with other valuable papers at the Phillipsburg Trust Co. These witnesses were disinterested. One was Dayton Little who acted as clerk for Nixon for years, reading his documents for him and assisting him with his papers generally. Another was Mrs. Elsa Bouder, who lives on a neighboring farm. She testified that even on the night before he died, Nixon detailed his property holdings and said that his will was in the deposit box in the bank. Miss Margaret Barber, a person of highest standing and of unimpeachable reputation in the community testified that she had known Nixon practically all her life and that he often visited her at her home and confided in her his financial affairs. She saw him last just two weeks before his death. On that occasion Nixon told her something of the provisions of his will and stated that the document was in his lock box in the Phillipsburg Trust Co.

An employee of the bank produced records to show that Nixon entered his safe deposit box No. 350 on Saturday morning, August 22d, 1942—the very morning on which it

was claimed that he went to Thompson's office to have the present document prepared. The bank records further show that Nixon entered this box four times thereafter at intervals of about every two weeks until his death. There was no testimony offered to the effect that Nixon had ever alluded to the document in Thompson's possession as his will.

The decision in the Bartles case, *supra,* turned largely on the fact that the testator had retained custody and control of his will after execution. In the instant case, custody of the document was never in the testator but always with the attorney. If he had intended to make the subsequent 1942 document his last will, and understood its nature, is it not likely that he would have destroyed the 1940 will which remained in his box, in the same manner as he did the will drawn in 1941? Applying the words of the Court of Errors and Appeals in the Bartles case to the 1940 will found in the safe deposit box "it would have been the simplest thing in the world for testator to destroy it if he was not satisfied with it."

The reported cases in the courts of this state in which the presumption of undue influence was applied, do not seem to differentiate between undue influence exercised by a lawyer or by a layman. The question as to whether or not there is a distinction seems not to have been heretofore raised or decided. Of the cases cited herein, those of Neuman, Smalley, Colton and Lynch involve undue influence exerted by a layman; in the Bartles, Romaine and Cooper cases a lawyer was the confidential adviser involved. A more convincing explanation of all the circumstances surrounding the execution of a will should be expected of a lawyer than of one not a member of the bar. Particularly so in his dealings with an illiterate client. Vice-Chancellor Kays in the recently reported case of *Schenck* v. *Davis,* 133 *N. J. Eq.* 81 (not a will contest), pertinently observed:

"Courts have laid down a rule of 'strict scrutiny' relative to transactions between attorney and client. The rule is intended to protect a client against a 'strong influence' which arises from the confidential relationship between a lawyer and his client."

See, also, *Dwyer* v. *Anderson,* 113 *N. J. Eq.* 210; 166 *Atl. Rep.* 293 (not a will case), for a statement of the responsibility of an attorney.

The confidence which must necessarily be reposed in an attorney by a client requires a higher standard of integrity than is expected of a layman. The bar demands and the public has the right to expect that a lawyer realize the sacredness of his trust and the necessity for irreproachable professional conduct. A case such as this demands an explanation made with convincing candor. It is the solemn obligation of the courts to uphold and enforce these principles.

However, without placing any added burden on Mr. Thompson by reason of the relationship of attorney and client, the evidence considered as a whole renders his denial of complicity in the making of this will unconvincing. Consideration of all the evidence and observation of the witnesses and their demeanor on the stand leads to the conclusion that the burden cast upon the proponent of overcoming the presumption of undue influence by credible and convincing evidence has not been met. Probate must be denied. The order appealed from is reversed and the letters testamentary revoked. Counsel may submit a decree in accordance with this opinion on three days' notice.