Carroll *v.* Hause.

---

BRIDGET CARROLL, appellant,

*v.*

GERTRUDE A. HAUSE, by her next friend, respondent.

1. Against a beneficiary having a testator under his control, with power to make his will, the will of the testator, especially in a case where the testator has made an unnatural disposition of his property, the law presumes undue

influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator.

2. Whatever constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, no matter by what means the control is exercised. The extent of the influence, whether powerful or slight, is wholly immaterial, for the test is, was it sufficient to destroy free agency; if it was, it will be held to be sufficient to render the instrument invalid.

On appeal from a decree of the orphans court of Essex county.

*Mr. William B. Guild,* for the appellant.

*Mr. Charles Borcherling,* for the respondent.

THE VICE-ORDINARY.

This is an appeal from a decree of the orphans court of the county of Essex, refusing probate to a paper purporting to be the will of Patrick Monaghan, deceased. The reason assigned in the decree for refusing to admit the paper to probate is, that it had not been published by the decedent as his will in the manner required by the statute concerning wills. I cannot concur in that view, but for another reason I think the decree is clearly right and should be affirmed. The proofs show very clearly, as I think, that the paper is the product of undue influence.

The decedent signed the paper in question on the 26th day of December, 1889, when he and those about him believed he was in the grasp of death and could live but a very short time. He was very sick, and so extremely weak as to be unable to write his name; he signed the paper by making his mark; he was a Roman Catholic, and had, shortly prior to the day on which he signed the paper, been prepared for death according to the rites of that church. He did not, however, die until the 16th day of January following. He was a widower, and for more than a year prior to his sickness had lived alone in a single room. Up until a few months before he was taken sick he had, for many

Carroll v. Hause.

years, drank to excess, but then stopped suddenly and afterward abstained rigidly. His only child, a daughter, died less than two years before he did. She died in childbed. The caveator is her daughter and the granddaughter of the decedent, and his their at law nearest in blood. The paper in question disinherits the decedent's grandchild and gives all his property to his sister, the appellant. She is his sole beneficiary. This sister and her husband had exclusive charge of the decedent from the commencement of his sickness up to the time of his death. Besides his grandchild and this sister, the decedent had a brother and nephew residing near him in this state and other relatives in Ireland. He was a native of Ireland. He had a strong affection for his grandchild. This he manifested by both act and speech. During the last year of his life he said, many times, that she should have all of his property that was left after his debts were paid. He did not want to make a will. Both his sister and the priest having the care of his soul tried unsuccessfully, prior to the day on which the paper in question was signed, to persuade him to make a will. The priest says that the decedent was a very peculiar man and did not wish to make a will, notwithstanding he had advised him, as it was his duty to do as his priest, that he ought to make a will. He says the first time he spoke to him about making a will the decedent did not think he was dying, and for that reason said he would defer making it until some future time. His sister swears that she never attempted to persuade the decedent to make a will, but her testimony on this point is, in my judgment, completely swept away by the other evidence in the case. There is evidence going to show that she urged him so persistently to make a will that he denounced her efforts as torture. Besides, it must be remembered that he was completely in her power. His condition was one of utter helplessness; he could do nothing for himself; he was dependent on her for everything; no comfort came to him except from her hands; she occupied a position, therefore, where she could dominate his mind and will with little danger of detection; where she could even constrain him to stifle the love he felt for his little grandchild and make just such a will as she says he did

Carroll *v.* Hause.

make.   Against a beneficiary thus having a testator under his control, with power to make his will the will of the testator, especially in a case where the testator has made an unnatural and unjust disposition of his property, the law wisely presumes undue influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator.   *Dale* v. *Dale, 11 Stew. Eq. 274, 276.*

The sister of the decedent swears that the desire to make the will in question originated with the decedent, and that he made this desire known to her on the afternoon of the 26th of December, 1889, while she was preparing food for him, by saying, " If I had a man I should like to draw a will ; " that she replied, " all right," and then, after she had finished what she was doing, she went out and sent her husband for the priest.   Her husband says that he went for the priest and told him that the decedent would like to have a will drawn, and asked him to come down and draw it.   The priest, however, testifies that the husband said that the decedent was dying and had made no disposition of his earthly goods—not that the decedent wanted to have a will drawn.   That the priest was not informed that the decedent wanted a will drawn, or that he desired to make a will, is made entirely certain by what the priest said to decedent when he called on him.   He called a few hours after receiving notice that the decedent was dying.   He says he went to decedent's bed and asked him, in the presence of two witnesses, if he knew he was about to die, and that decedent replied that he did.   He says, then, " I told him I thought it was better for him to arrange his account, otherwise there would be litigation after his death." In the same connection he says, " I spoke to him, and reiterated again and again, and asked him what he would do, and how he intended to dispose of his property.   He told me he would leave his property to his sister Bridget."   A person who was present at this interview, and who signed the paper as a subscribing witness, says, that before the decedent said he would leave his

Carroll v. Hause.

property to his sister the priest asked him if he had any relatives in this country, and that the decedent replied none except his sister; and that the priest then asked to whom he intended to leave his property, and that decedent replied to his sister. The priest then drew the paper called a will and had the decedent put his mark to it. This statement shows how the paper came to be drawn and signed.

Undue influence consists in the destruction of free agency. Whatever constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, no matter by what means the control is exercised. The extent or degree of the influence is wholly immaterial, for the test is, was the influence, whether powerful or slight, sufficient to destroy free agency, so as to make the act brought in judgment the act of another rather than the expression of the mind and heart of the actor. Undue influence exercised by any one, whether he or another gains by its exercise, renders the will or other instrument thus procured worthless. These principles are so well settled and familiar, and so obviously essential for the protection of those suffering from sickness or subject to the infirmities of old age, as to dispense with the citation of authority. Applying them to this case, it is clear that the paper under consideration is the product of undue influence. Left to himself, it is manifest that the decedent would have died intestate. He did not want to make a will. When he was first advised by his priest to make a will he refused, or deferred doing so until another time. His priest says he refused because he did not think he was dying. But now he is told he is about to die; he believed he was in the grasp of death; he is also told that it will be better for him to make a will, and that if he does not litigation will follow his death. These words came to him from his spiritual adviser— from the man to whom he had committed the welfare of his soul and in whom he reposed the highest and holiest trust that it is possible for one human being to repose in another. Spoken by such a person, at such a time, they were invested with all the coercive force that words can ever have. To the decedent their force was irresistible. They not only subdued and broke his will,

18

but put his recollection in a state of chaos. They made him forget his grandchild, his brother and his nephew. He said he had no relatives in this country except a sister. The words possessing the greatest force were false. The priest had no warrant whatever for declaring that if the decedent did not make a will there would be litigation after his death. No matter with what motive or for what purpose this declaration was made, there can be no doubt that, though entirely false, it operated as a powerful appeal to the fears of the decedent, and, coupled as it was with the advice of his priest that it was better for him to make a will, that it constrained him to do what he did not want to do, and what he would not have done if left to himself.

The decree of the orphans court should be affirmed, with costs.