The matter sub judice is an application to vacate an order made January 6th, 1932, admitting to probate a paper-writing purporting to be the last will and testament of Anna E. Romaine, deceased, who, at the time of her death, was a resident of the city of Paterson, and directing that letters testamentary thereon be issued to Kate Romaine Roberts, J. Chester Massinger and Grace Baily, the executors named in said instrument, upon their qualifying as such executors. Said instrument was probated in what is denominated common form. The petitioner seeks to require said executors to probate the will in what is denominated solemn form. The purported will appears, according to the proofs herein, to *Page 479 
have been executed March 16th, 1929; it was prepared by J. Chester Massinger, a proctor of this court, one of the defendants herein. The testatrix died December 26th, 1931, at the age of ninety-four years. It appears therefore that the purported will was executed when the testatrix was of the age of ninety-two years. The instrument was typewritten by Helen D. Ward, a stenographer-employe of Mr. Massinger; after it was prepared Miss Ward, George D. Anderson, Jr., and Mr. Massinger went to the home of the testatrix and were parties to the execution of said instrument. Miss Ward and Mr. Anderson were subscribing witnesses thereto. By the terms of the purported will of said testatrix, Mr. Massinger and one Gladys Baily were designated as the chief beneficiaries thereunder. The estate of the testatrix is of considerable value; some of the affiants herein indicate the value to be upwards of $500,000. Among the assets of the estate is an office building in Paterson, New Jersey, known as "Romaine Building." Kate Romaine Roberts, a daughter of the testatrix, and Gladys Baily and J. Chester Massinger were named as executors and trustees of said will. Applications such as sub judice are addressed to the sound discretion of the court. Cases in which proof in solemn form were considered are: In re Straub, 49 N.J. Eq. 264; affirmed, 50 N.J. Eq. 795; Murray v. Lynch, 64 N.J. Eq. 290; affirmed, 65 N.J. Eq. 399; In re Hodnett, 65 N.J. Eq. 329; In re Whitehead, 85 N.J. Eq. 114; affirmed, 86 N.J. Eq. 439;In re Harrison, 94 N.J. Eq. 145; In re Allison, 106 N.J. Eq. 55.
The Hodnett Case, supra, appears to be the leading case on the subject. The opinion of Chancellor Magie, sitting therein as ordinary, contains an elaborate review of the law covering probate in solemn form and sustains the power of this court to require such probate when a proper case is presented. With reference to the grounds which should be established for the exercise of such power the ordinary said (at pp. 343, 344): "Under our practice, pursuant to which a contest may be raised by anyone interested by caveat or appeal, I think probate in solemn form ought not to be compelled, except upon some good ground shown. It is manifestly *Page 480 
unnecessary to prove that the probate previously granted had been improperly granted by showing that testator did not in fact possess testamentary capacity, or that the will was in fact the product of undue influence, c. It will be sufficient to justify the ordinary in requiring probate on notice if there is made to appear to him a fair ground for contesting the validity of the will in respect to its execution, or the testamentary capacity of the testator, or as to the will being the product of undue influence." In In re Harrison, supra, Chancellor Walker (at p.148) declared: "Probate in solemn form is not a matter of absolute right for the asking, it rests in the sound discretion of the court. In the language of Chancellor Magie, supra, it is allowed `whenever a proper case for such action is presented,' and, further, `I think probate in solemn form ought not to be compelled except upon some good ground shown,' and, still further, `it will be sufficient to justify * * * requiring probate on notice if there is made to appear * * * a fair ground for contesting the validity of the will, * * *.'" In In reAllison, supra, Vice-Ordinary Lewis cites the Hodnett Case,supra; In re Whitehead's Estate, supra, and others. The following is an extract from the opinion (at p. 59): "TheHodnett Case, supra, has received recognition and been cited with approval in the recent cases of In re Whitehead's Estate,85 N.J. Eq. 114, and In re Harrison, 94 N.J. Eq. 145. As there stated, the exercise of this power rests in the sound discretion of the court and should be exercised only when a proper case for such action is presented. In re Harrison, supra." Considerable matter is stated in the affidavits now before the court indicative of exercise of undue influence upon the testatrix by the chief beneficiaries of the will, J. Chester Massinger and Gladys Baily, with respect to the making and execution by testatrix of the paper-writing in question purporting to be her last will and testament; also indicative that testatrix lacked testamentary capacity; also that testatrix suffered hallucinations. Affidavits of William H. Rauchfuss, a chiropractor, and of Dr. Arthur L. Newman, a practicing physician of the city of Paterson, are very strongly *Page 481 
indicative thereof. Dr. Rauchfuss says he came in contact with the testatrix very frequently over a period of seven years prior to her death; that she was quite deaf and that her condition of deafness grew worse towards the end, so much so that it was necessary for him to shout at her and talk very slowly in order to make her understand him, and even then very frequently she could not understand him and it was necessary for her daughter, Mrs. Roberts, to interpret what he had said to testatrix. His affidavit recites that he observed on a number of occasions that while testatrix was talking about something, any interruption would break her train of thought, and she was unable to take up the discussion again unless she was reminded where she had left off. He says that in the last year before her death she had great difficulty in recognizing him when he visited her; that she would stare at him for a few moments as though she had never seen him before, and her daughter, Mrs. Roberts, would have to say to her, "Dr. Rauchfuss is here," and repeat it several times, and then Mrs. Romaine would say, vaguely, "Oh, yes, Dr. Rauchfuss." His affidavit recites: "Upon my observation of her conduct, I know that Mrs. Romaine could be easily led or influenced by any person who ingratiated himself with her." He also says: "During the last few years before Mrs. Romaine's death, Miss Gladys Baily was almost always at the Romaine house when I called there. She was always in the room with Mrs. Romaine until I had left, and I noticed that while Miss Baily was there, Mrs. Romaine never greeted me with the same cordiality or talked to me with the same affability; she always seemed rather restrained and distant when Miss Baily was present. J. Chester Massinger was also present at the Romaine house on several occasions when I called there." Dr. Arthur L. Newman's affidavit says that he attended Mrs. Romaine (the testatrix) for a period of about twenty years, that is, from the year 1911 to June 22d 1931 (Mrs. Romaine died December 26th, 1931); that she stated to him it was her intention to leave all her property to her daughter, Mrs. Roberts; that Mrs. Romaine mentioned to him on many occasions her daughter's kindnesses *Page 482 
to her and how grateful she was for those kindnesses, and that she "told me that it was because of those kindnesses and her daughter's affection for her that she was going to leave everything to her daughter, and that if Mrs. Roberts wanted to leave anything to the hospital and orphan asylum she could do that by her own will." With respect to a will of Mrs. Romaine — dated February 24th, 1928, which he subscribed his name to as a witness, together with Helen D. Ward, who, as appears from the proofs herein was a stenographer-employe of J. Chester Massinger, one of the defendants herein, and at a time when Gladys Baily and Mr. Massinger were present, Dr. Newman says that Mrs. Romaine did not read the will in his presence nor did anybody read it to her; that nothing was read to her except the wording of the attestation clause, and such was read to her by Mr. Massinger; that after such attestation clause was read to her, Mr. Massinger placed the document on a table and indicated that Dr. Newman should sign it and he did so. He says he signed his name first under the attestation clause and put down his then address; that after he signed he saw Miss Ward sign her name and address. He said that when he signed his name to the attestation clause Mr. Massinger placed the document on the table in such a way that only the attestation clause itself and none of the rest of the document could be read by anyone signing under the attestation clause. The affidavit of William P. Morris, dated June, 1932, recites a conversation which the affiant says he had with Dr. Harold J. Durant (who made affidavits which were filed herein in behalf of the defendants) wherein Mr. Morris remarked to Dr. Durant that he did not believe Mrs. Romaine was capable of making the will now in question because of her greatly advanced age and the influences surrounding her, and that Dr. Durant replied that he also did not think Mrs. Romaine had been capable of making the document which had been probated. The affidavit of Matilda Rieg, a neighbor of Mrs. Romaine, is indicative that Mrs. Romaine may not have been, in 1929, competent to make a will, and also that Mrs. Romaine told her that someone wanted to buy her house and that she *Page 483 
told him that the price was $999,000 cash, and that she said that she had put such a high price on the house so that no one could get it because she wanted it to stay in the family. Mrs. Rieg's affidavit is also strongly indicative that Grace Baily was at the home of Mrs. Romaine most of the time when Mr. Massinger was there, and that on occasions when Mr. Massinger arrived, Mrs. Rieg would see Miss Baily enter the house a few minutes thereafter. She says Miss Baily was there almost daily. Mrs. Rieg's affidavit recites: "I was present on one occasion when Miss Baily was in the Romaine house, when Mrs. Romaine said (referring to Miss Baily): `Look, here she is again, the pest.'" Mrs. Rieg's affidavit says that she believes that the actions of Mrs. Romaine and her daughter (Mrs. Roberts) on Thursdays, before Mr. Massinger came and after he left, were such that she believed, from their actions and expressions, they were both afraid of him. The affidavit of Dr. O.B. Duncan, a practicing physician of Paterson, New Jersey, impresses me that Mrs. Romaine for a period of about five years prior to her death had difficulty in comprehending simple questions, and gave disconnected, rambling answers and suffered hallucinations. The affidavit recites in part: "I do not believe Mrs. Romaine had a mind capable of thinking out a business deal, or even directing one. She had a `bossy' way about her but it was in word rather than in deed. She could not carry a thought through to a conclusion, and could not remember a thing more than a few minutes at a time. In my opinion Mrs. Romaine * * * was very easily led, and if she were told that black was white and she liked the person who told her, or if that person showed her considerable deference, she would believe his statement. In my opinion, she was the subject of hallucinations and her mind was giving way to senile degeneration. During the five years prior to her death she was quite deaf and seemed to get worse as she grew older. In conversing with her, I was compelled to elevate my voice and to repeat my statements to her two or three times, and coupled with that, it was extremely difficult for her to get the thought I was trying to express. In my opinion, she *Page 484 
was not capable of making a will for at least five years prior to her death, and I do not believe she had mentality enough to understand a will even though it was explained to her at great length. She could be easily influenced, if she liked the person trying to influence her, and would do anything that was asked of her." The statements of Dr. Duncan as to Mrs. Romaine's progressive deafness and her difficulty in comprehension is corroborative of the sworn statements of Dr. Rauchfuss with respect thereto. I cannot very well allude herein to all pertinent matters of importance which may properly be considered in determining the legality of an instrument purporting to be a last will and testament, which are contained in the numerous and voluminous affidavits filed herein which I have read and considered. It is not necessary for me to pass judgment upon the legality of said instrument; the legality thereof can only be judicially determined after a full and fair hearing by the court in a proceeding for solemn probate when the various affiants and other witnesses who may be called to testify will be subject to examination and cross-examination; nevertheless, I deem it necessary and appropriate for me to say that I am of the opinion that sufficient is shown in the papers sub judice to require the proponents Massinger and Baily to sustain the burden which the law casts upon them to show that they did not exert or exercise undue influence upon the testatrix, and that she, aged woman that she was, being ninety-two years of age when the alleged will was executed, possessed sufficient testamentary capacity to qualify her to make, publish and declare her last will and testament. In my opinion the various decisions of our court of errors and appeals in cases presented to said court in matters germane to the matter sub judice do not question the well established rules (1) that the existence of a confidential relationship is a factor to be cautiously scrutinized and considered, and that while such advantage alone is not sufficient to cast upon proponents of a will the burden of showing lack of undue influence, slight circumstances in addition thereto will be sufficient therefor; and (2) that the intervention of a chief beneficiary under a will, in the drafting of said instrument *Page 485 
and attending the execution thereof, particularly when as in the instant case one of the chief beneficiaries under the will is a lawyer who has represented the testatrix in her business affairs, and upon whom, as clearly manifest in the instant case, she has placed much reliance in guiding her in her business activities, and who never exacted payment from the testatrix for services rendered by him in her behalf in a considerable number of litigated matters and did not even expect her to reimburse him for costs and expenses advanced by him in such matters, and which lawyer was able to induce the testatrix, as in the instant case, to permit him to join with her in the management and care of her property holdings and her finances, and who also volunteered to personally obligate himself for the payment of debts incurred by the testatrix, by means of his endorsement of notes and the like made by her in furtherance of her business affairs, is a circumstance strongly presumptive of undue influence. Such, it appears to me, is clearly indicated by the affirmance of the court of errors and appeals (101 N.J. Eq. 825) of a decree advised by Vice-Ordinary Lewis in In re Ulrich, 98 N.J. Eq. 621,
reversing a decree of the Passaic county orphans court. A significant provision contained in the paper-writing in question, purporting to be the last will and testament of Mrs. Romaine, is that following the disposition of the property of the testatrix after the death of her daughter. Such provision recites: "Upon the death of my said daughter, I give, devise and bequeath all the rest, residue and remainder of my property, real and personal, to my friend and attorney, J. Chester Massinger, and to my friend, Gladys Baily, to be divided between them, share and share alike, and direct that said property be paid over and conveyed, one-half to each of them." Mr. Massinger was only acquainted with Mrs. Romaine for a few years prior to her death, and likewise Gladys Baily, and the fact that the will refers to each of them as my friend supports, in some measure, the statements of Dr. Newman, Dr. Rauchfuss and Dr. Duncan that Mrs. Romaine in the last few years of her life was subject to undue influence. Why Mr. Massinger should have represented *Page 486 
Mrs. Romaine in all her business transactions (and the proofs indicate that she had many thereof which were attended to by Mr. Massinger) without exacting payment from her for services rendered, and without exacting payment from her of costs and disbursements advanced by him in connection with such matters, is a matter which at the present time and in the matter sub judice
may only be conjectured. It appears, however, to be a matter which in connection with other circumstances mentioned in various affidavits submitted to me herein should be appropriately inquired into, and that such inquiry can only be made when the executors present to the court for solemn probate the paper-writing purporting to be the last will and testament of Mrs. Romaine. The affidavit of Gladys Baily evidences to me that she appears to have stuck pretty close to Mrs. Romaine for a considerable period of time prior to her death, and particularly within the last few years of her life, and that she thereby doubtless ingratiated herself. The affidavit of J. Chester Massinger evidences that on June 5th, 1929 (about three months after the execution of the will in question), he took joint control with Mrs. Romaine of the expenditures of the proceeds of the Romaine Building, an office building containing approximately seventy-four rooms on the three floors of the building and nine stores on the first floor thereof — a building which one or more of the affiants herein estimated at a value of $500,000 or thereabout. He says that previously to his having taken hold of not only the administration of the Romaine Building, but the handling of money in a joint account with Mrs. Romaine, the rents from the Romaine Building had been received by the Citizens Trust Company under an assignment of rent which was executed in the year 1914, and deposited in an account designated "Romaine Building, Rent Account." Mr. Massinger's affidavit discloses that in his dealings with Mrs. Romaine, and in discussing her financial affairs with her, and after he had accused the husband of Mrs. Romaine's daughter, Mr. Roberts, of not dealing fairly with Mrs. Romaine, but for his own benefit, he told Mrs. Romaine that he felt that he was wasting his time in *Page 487 
endeavoring to set her financial house to rights if she was not going to be more particular in the matter of signing notes, and he suggested to her that it might be well for them, that is, Mrs. Romaine and himself, to open up a joint account in the Citizens Trust Company for the payment of her bills of the building and her own allowance. He also discussed with her the payment of notes outstanding and advised that no more notes be executed by her with her daughter's husband, but that instead, he, Massinger, would join her in the execution of notes for any just obligations that she might have, and that his joinder would be as an endorser. He says that Mrs. Romaine assented to such plan and it was with her consent and approval that the account was opened. Why Massinger should be willing to obligate himself as an endorser upon promissory notes made for the benefit of Mrs. Romaine may be satisfactorily explained when opportunity therefor is afforded in a judicial proceeding wherein he may be examined and cross-examined, but at the present time such is merely conjectural. Mr. Massinger, in his affidavit, says: "I want to say now that in all the years that I have represented Mrs. Romaine I have never received one penny of compensation for the services that I have rendered. In this connection also, I feel that I should say that at the time I began to work for Mrs. Romaine there was no arrangement between us regarding a definite amount of compensation. It was agreed that I should be paid on the basis of the reasonable value of my services, and I told her at the time we discussed the matter of compensation that I would keep as good a record as I could of what I had done, and would do for her, but that I would not render her a bill until I had gotten her out of debt, except for the amount due on the two mortgages on her house and building." Such magnanimity upon the part of Mr. Massinger appears very gracious indeed, and why he should be so magnanimous as to refrain from looking to Mrs. Romaine for compensation for his services may be satisfactorily explained by him when opportunity is afforded him and when he may be examined and cross-examined as a witness in an orderly judicial proceeding, and *Page 488 
he should be afforded such opportunity. Mr. Massinger says in his affidavit that at the time of the opening of the joint account by himself and Mrs. Romaine a question came up regarding how much she would need as income. Ostensibly Mr. Massinger was able to placate Mrs. Romaine by having her agree to accept an allowance of $150 per month for her needs. Some of the affidavits filed herein manifest that Mrs. Romaine did not have the great confidence in Mr. Massinger that he and affiants in his behalf have indicated by their several affidavits. Mr. Massinger further says in his affidavit: "From the early part of 1928 until the time of Mrs. Romaine's death, she did not even like to have me go out of town, and she always was insistent that I be at her home on Thursday, or a day or two previous in the event that Thursday came on a holiday, in order that the checks might be made out. On several occasions when I had planned to go away, I suggested to Mrs. Romaine that I might sign the checks, and that she, or someone in her presence, could fill them in and she could sign them and issue them, but she would not consent to do that, and insisted that when the business in connection with the building was done, we both be present." He further says in his affidavit that he conducted a number of suits for Mrs. Romaine and drew many leases and bills of sale "yet I was never reimbursed for even my disbursed costs in the litigation which I conducted for her." In denying, by his affidavit, charges made by affiants in affidavits filed herein, that he had excluded from participation in his business conferences with Mrs. Romaine persons who might properly have been allowed to be in attendance thereat, he says: "It seemed to be generally understood, and I think was quite right, that persons more or less strangers, should not be present during the confidential interviews touching the private affairs of Mrs. Romaine and Mrs. Roberts. I found that Miss Baily was an intimate friend of the family and was welcomed at these interviews. Everybody else who happened to be around when the conferences took place, always, of his own accord, left the room. Any servant was, of course, never present, except on several occasions when the janitor of the *Page 489 
building, Julius Lecher, was asked to come into the conferences by Mrs. Romaine, for the purpose of taking up with her and me matters in connection with the building. In this connection, I positively deny that either in his presence, or on any other occasion, did I demand, or even suggest that Mrs. Romaine make a will. The only thing that I ever knew about a will of Mrs. Romaine, prior to my having drawn one for her, was that she stated to me that she had had a will made by the Citizens Trust Company, and that they were the executors of her will, and that she desired to revoke that will and make a new one, and she stated to me that she was going to get it and burn it up. I never laid eyes on the will, and never told her to burn it up; never saw her burn it, and for aught that I know, except what she told me, the will may yet be in existence. Among the reasons she stated for desiring to destroy that will were first — in her previous will she said that the property was left outright to Mrs. Roberts, and her apprehension that if that should continue, Mrs. Roberts' husband might gain control over the property, and Mrs. Roberts expressed the same feeling. Secondly, she expressed the desire to have me manage, as executor, her estate for her and for Mrs. Roberts, after her death." He further says, in his affidavit, that sometime after the conversation just hereinabove alluded to touching upon the former will, Mrs. Romaine instructed him to draw a will, which he did, and such will was executed on February 24th, 1928. He says that when such will was made it was left in possession of Mrs. Romaine and "subsequently came into my possession, and has ever since been kept by me as hereinafter explained. The original is now in my possession." The question suggests itself as to why he kept that instrument in his possession when by the later will he drew in 1929 all previous wills were expressly revoked? He says that in March, 1929, in talking with Mrs. Romaine she mentioned a proposed change in her will, and "she told me that she knew that she was considerably indebted to me for what I had done for her and probably would do for her, and that she realized that she could not afford to compensate me then, *Page 490 
and that she might not live long enough to compensate me, and that after Mrs. Roberts' death there was no one to whom she would as leave leave her property as me, and that she wished that, if I would take it, to leave her property to me as compensation for my services rendered and that I would render to her and Mrs. Roberts. Mrs. Romaine then expressed the thought that I was not well to do, and I told her that I was not, and also told her exactly what I did have, and she replied that that was not very much. I told her, however, that I thought that the bequest to me of her entire estate after Mrs. Roberts' death was more than I was entitled to, or would be entitled to. Some discussion followed, with the result that Mrs. Romaine, who expressed the greatest fondness for, and appreciation of Miss Baily, determined to divide the corpus of the estate, after the death of her daughter, between Miss Baily and myself. Miss Baily was not present during any of this interview. Mrs. Romaine expressed the desire that her daughter, Miss Baily and I should be the executors, as in the previous will, and I left, drew the will and it was executed on the day it bears date." He further says: "After I dictated the will in question to my secretary, Miss Ward, I arranged, while at luncheon with an acquaintance, Mr. Anderson, a lawyer of standing in Paterson, to have him attend with Miss Ward at the execution of the will." Mr. Massinger, in another part of his affidavit, mentioned that in the spring or summer of 1931, Mrs. Romaine stated to him that she believed somebody had been tampering with her safe in the house in which she kept her papers and jewelry, and that she wanted him to take the wills down to his office and keep them and that she intended to take her jewelry out of the safe and put it elsewhere in the house. He offered to permit her to take the jewelry downtown and put it either in his safe or in a safe deposit box for her in her name, but she said that she preferred to keep those personal effects at the house. He says that both of the wills which he had prepared for Mrs. Romaine (apparently referring to the will of 1928 and the will of 1929) remained in his possession until after Mrs. Romaine's death. *Page 491 
I am firmly of the opinion in the matter sub judice that not only should this court in the exercise of its sound discretion grant the prayer of the petitioner herein for a vacation of the order heretofore made for probate, in common form, of the paper-writing purporting to be the last will and testament of Mrs. Romaine, and require proofs before this court in solemn
form as to the legality of such instrument, but that for public safety, and as a means of exonerating Mr. Massinger, an officer of this court — a member of the New Jersey bar — of any possible suspicion of wrong-doing in connection with the preparation of said instrument, and circumstances relating thereto, and the execution and publication thereof, as and for the last will and testament of Mrs. Romaine, that this court should require the executors named in said instrument, one of whom is Mr. Massinger, to proffer said instrument for probate in solemn form. This case manifests a fair ground for the court to inquire into the validity of the will in question, and is what the courts have declared a proper case therefor. All of the reported decisions clearly manifest that in cases where an attorney, who had been the legal adviser of the testator for some years, prepared the will whereby he was appointed executor, and received under the provisions of said instrument a substantial part of the estate of the testator, as residuary legatee (as in the case in question) there was a presumption of undue influence upon the part of such attorney, and the burden of proof that the will was the free act of the testator was cast upon him. It is a well established rule of law that the burden of proof is thrown upon the person upon whom confidence is reposed, and who had acquired an advantage, to show affirmatively, not only that no deception was practiced, no undue influence used, and that all was fair, open and voluntary, but that the transaction was well understood. In Dwyer v.Anderson, 113 N.J. Eq. 210, it was held that all transactions of an attorney with his client will be carefully scrutinized, to the end that the client may be protected from his own credulity, and from the influence which the relation of attorney and client generates, and that courts of equity intervene, upon considerations *Page 492 
of public policy, to prevent fraud and abuse of confidence and influence, and to compel fidelity in the performance of fiduciary duty. The court says (at p. 213): "* * * Both courts and lawyers should welcome any inquiry into the fairness of transactions between attorney and client, and courts should never hesitate to condemn where the conduct of the attorney has been unconscionable. In no other way can the high reputation of the legal profession, of which its members are justly proud, be maintained. Raimondi v. Bianchi, 100 N.J. Eq. 238. The confidence which the relation begets between attorney and client, and the influence which the attorney thereby acquires, has always led to a very close scrutiny of all transactions between them. The burden always rests upon the lawyer to establish perfect fairness, adequacy and equity of negotiations with his client, and, in the absence of such proof, courts of equity treat the case as one of constructive fraud. Condit v. Blackwell,22 N.J. Eq. 481." And the court further says (at p. 214): "In transactions such as these, the court leans most strongly against the attorney, who, while acting as such, has business relations with his client on his own account. Perkins v. Deal BeachRealty Co., 92 N.J. Eq. 526." And on the same page the court says: "A court of equity intervenes upon consideration of public policy, to prevent fraud and abuse of confidence and influence, and to compel fidelity in the performance of fiduciary duty. Relief will be afforded in equity in all transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Proff v. Shirvanian, 110 N.J. Eq. 639." In In re Colton, 11 N.J. Mis. R. 410, it was held that where a beneficiary is a confidential adviser to the decedent and also draws or procures the drawing of his will, the combined circumstances raise a presumption of undue influence calling for a complete vindication of the beneficiary's conduct. In the same case Vice-Ordinary Backes (at p. 421) says: "The related circumstances, procurement of the will by the principal beneficiary added to the fact that he stood in confidential relation to the testatrix, according to the doctrine of Sparks *Page 493 Case, 63 N.J. Eq. 242; 51 Atl. Rep. 118; Cooper's Will, 75 N.J. Eq. 177; 111 Atl. Rep. 26; followed in Morrisey's Will, 91 N.J. Eq. 480; 71 Atl. Rep. 676, raise a presumption of undue influence calling upon the beneficiary to dispel it by evidence satisfactorily explaining his conduct." The vice-ordinary citedBarry v. Butlin, 2 Moo. P.C. 480, wherein Baron Parke said: "The drawing of a will by one substantially benefiting by it when coupled with other evidence of fraud or imposition is of very great weight but in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court in investigating the case and calling upon it not to grant probate without a full and entire satisfaction that the instrument expresses the real intention of the decedent." The same excerpt was quoted by Vice-Ordinary Van Fleet in Bennett
v. Bennett, 50 N.J. Eq. 439, and was declared by him to be the established law of this state, and the vice-ordinary cited (atp. 448) Rusling v. Rusling, 36 N.J. Eq. 603, 609, wherein the unanimous judgment of the court of errors and appeals was pronounced that while the fact that one of the favored legatees had drawn the will was not sufficient in itself to invalidate the will, it certainly was a matter which should excite the judicial mind to scrutiny. In In re Colton, 166 Atl. Rep. 521 (at p.526), and 11 N.J. Mis. R. 410 (at p. 423), the prerogative court declared: "Where, however, the beneficiary is confidential adviser to the decedent and also draws or procures the drawing of his will, the combined circumstances raise a presumption of undue influence calling for a complete vindication of the beneficiary's conduct. The rule that the coupled circumstances give rise to a presumption of undue influence, is essentially a rule of evidence for the better ascertainment of the truth in the satisfactory determination of the ultimate resolution `that the instrument expresses the real intention of the decedent' and its exercise finds expression in all the cases presenting the dual status of beneficiaries." In Carroll v. Hause, 48 N.J. Eq. 269, it is said: "Against a beneficiary having a testator under his control, with power to make his will, the will of the testator, especially in a case where the testator has made an unnatural *Page 494 
disposition of his property, the law presumes undue influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator." In In re Ulrich, 98 N.J. Eq. 621,
the court declared that the active agency of the beneficiary of a will in procuring it to be drawn in his favor, especially in the absence of those who have, at least, an equal claim upon the justice of the testator, and where the testator is enfeebled by old age and disease, is a circumstance strongly indicative of undue influence. In Lynch v. Clements, 24 N.J. Eq. 431 (atp. 435), Vice-Chancellor Dodd quoted 1 Redf. Wills 510, 514:
"In regard to undue influence the cases are almost infinite in number and variety. It is not possible to reduce them into any systematic classification. Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation." Where a will is proved in common form, the court, at any time within thirty years after probate, might, under the old law, on its own motion, or at the instance of the next of kin or other person interested, require the executor to prove the will in solemn form. Williams onExecutors, § 271. The prerogative court has the power and authority to require an executor who has proved a will before it without notice, to prove the same will with notice to all parties whenever a proper case for such action is presented. It should be sufficient to justify the ordinary in requiring probate on notice if there is made to appear to him a fair ground for contesting the validity of the will in respect to its execution, or the testamentary capacity of the testator, or undue influence. The instant case is within the rule stated. The principles of law set forth in the above cited authorities are applicable to the case sub judice. I will advise an order as prayed by the petitioner. *Page 495