Decedent Flora E. Smalley, a maiden lady, died at her home, 10 Garden street, Chatham, at the age of seventy-nine years. Her nearest relatives were Mrs. Mary L. Bolles, a sister of the whole blood, residing in Ohio for the past sixty years, and Mrs. Minnie A. Alexander, a sister of the half blood who, from the time of her birth sixty-seven years ago, has resided with decedent continuously up to decedent's death.
Miss Smalley had been a school teacher and had accumulated an estate of about $19,000. She made a will dated April 28th, 1932, the important provisions of which were (a) that Mrs. Alexander should have the right to occupy 10 Garden street so long as she wished and when she ceased to occupy, *Page 462 
the premises should be sold and from the proceeds $2,000 should be paid to her and $2,000 to Mrs. Bolles and the balance should fall into the residuary; (b) that the income from the residuary should be equally divided between Mrs. Bolles and Mrs. Alexander and at the death of either, the deceased's share of income should be divided equally between Miss Smalley's two nephews, William B. Bolles (son of Mrs. Bolles), and Herbert M. Alexander (son of Mrs. Alexander); that after the death of both sisters the residue should be divided one-third to William Bolles and two-thirds to Herbert Alexander.
The latter part of June, 1937, Miss Smalley, through her nephew, Herbert, sent word to an attorney of this state that she desired to see him. He called at her home and learned she wished to make a new will. He conferred with her alone, discussed the provisions of the 1932 will and received her instructions as to what changes she desired made therein. He prepared a new will following closely the provisions and scheme of the 1932 will, but making the following changes therein: (a) that Mrs. Alexander should have 10 Garden street for life on condition that she occupy it as a residence and upon her death, or ceasing to occupy, the premises should be sold by the executors and if the proceeds be $4,000 or less, the same should be divided equally between Mrs. Bolles and Mrs. Alexander, but if the proceeds exceed $4,000, the executors pay $2,000 to each sister and the balance to fall into the residuary; that if either sister be dead at the time of sale, the proceeds up to $2,000 be paid the surviving sister and the balance paid into the residuary, and that if both be dead, the whole proceeds to fall into the residuary; (b) that the entire residue should be invested by the executors and the income paid equally to Mrs. Bolles and Mrs. Alexander, and upon the death of either, the deceased's share of income be divided equally between Miss Smalley's nephews. William Bolles and Herbert Alexander, and upon the death of both sisters, the entire residue be distributed one-third to William Bolles and two-thirds to Herbert Alexander. The attorney came to Miss Smalley's home with the prepared will, saw her *Page 463 
alone, read the will to her, discussed its provisions and when she had expressed her satisfaction with it, had her execute it in the presence of two neighbors to whom she declared it to be her will. This will was executed June 25th, 1937, and was left with her by the scrivener.
Two days later the nephew, Herbert Alexander, called on Miss Smalley and talked with her alone. The will was produced and discussed, and the next day Alexander notified the attorney that Miss Smalley desired to change her will, outlined the changes and requested the attorney to meet him at Miss Smalley's home the following night. They met and the attorney, Alexander and Miss Smalley discussed the changes. The following day the attorney redrew the will, copying all provisions in the will of June 25th, except a minor change in a clause concerning care of a cemetery plot and except also the following changes in the specific provisions to which I have referred: (a) that Mrs. Alexander should have an estate for life in 10 Garden street upon condition that she occupy it as a residence; that upon her death, or ceasing to occupy, the executors should sell and, if she be living, invest the proceeds and pay her the income for life and upon her death pay the proceeds to Herbert Alexander; (b) that the executors should invest the residuary and, during the life of Mrs. Alexander, pay one-half of the income to Mrs. Bolles and the other half to Mrs. Alexander and upon the death of Mrs. Alexander, pay the entire residue of her estate to Herbert Alexander. The next day the attorney came to Miss Smalley's home with the new will, saw her alone, and after the new draft was read to her, or she read it, called in witnesses and the will was executed June 29th, 1937. A few days later Herbert Alexander was again at Miss Smalley's home, saw her alone when she produced the executed will, and he and she read it together.
Miss Smalley died July 12th, 1937, and her last will was admitted to probate by the surrogate of Morris county July 24th, 1937. Appeal to the orphans court was subsequently taken to set aside the probate on the grounds of (1) testamentary incapacity, (2) defective execution and (3) undue influence, *Page 464 
and the orphans court entered its order May 13th, 1938, confirming the order of the surrogate admitting the will to probate. The appeal here is from the order of the orphans court, on the record from the court below, the only ground urged on this appeal being undue influence on the testatrix exercised by Herbert Alexander.
The differences between the 1932 will and the June 25th will on the one hand, and the June 29th will on the other are striking and material. Two days after Herbert Alexander had been alone with Miss Smalley and discussed the June 25th will with her, she executed the probated will which eliminates her sister, Mrs. Bolles, as a beneficiary in the proceeds of sale of 10 Garden street, both as to corpus and income, and cuts down her interest for life in the income from a lessened residuary estate by limiting it to the life of Mrs. Alexander and entirely cuts off her nephew, William Bolles, as a remainderman in the residuary estate. All benefits which the testatrix had theretofore provided for her sister and her said nephew were transferred to Alexander.
Alexander was about forty-five years old. He had lived with Miss Smalley and his mother until he married and thereafter was a frequent visitor at Miss Smalley's home where he was received on friendly and close terms, so much so that she had loaned him money on several occasions and in each of her wills had provided for cancellation of his indebtedness to her. She reposed confidence in him and he was familiar with her business affairs, advised her concerning them and she trusted him.
The attorney who drew her wills of June 25th and June 29th was a distant relative of Miss Smalley and Alexander and had performed legal services for Alexander when the latter purchased a home, with the assistance of $4,000 loaned him by decedent secured by second mortgage thereon, and the attorney had performed no legal services for decedent other than to see that she received that mortgage. The will of June 25th discloses that at that time decedent had a friendly feeling for her two sisters and two nephews, recognized them as objects of her bounty and desired to make provision for *Page 465 
them. The testimony shows that although Mrs. Bolles was a resident of a distant state and decedent saw her infrequently, they corresponded with more or less regularity and two letters written by Miss Smalley to Mrs. Bolles were received in evidence, one dated April 26th, 1934, and the other dated June 11th, 1937. Both are addressed "My Dear Sister," and make friendly reference to her nephew William. They are long, "gossipy" and affectionate and contain evidence that the friendly feeling which the writer had for her sister and nephew had undergone no change since the execution of the 1932 will. Two days after the June 25th will was executed, Alexander learned its contents. At a conference with Miss Smalley, he says she reversed her attitude toward her sister, Mrs. Bolles, and her nephew, William, and determined to cut down substantially her provision made two days before for "my dear sister" and entirely eliminate the nephew as a legatee and give Alexander what she took from them.
When one standing in a confidential relation with the testatrix is the chief beneficiary under her will and is charged with having exerted influence on the testatrix to make such provision for him, the fact that he is the person who chiefly benefits by the will is a factor to be considered, and while not in itself sufficient to cast on him the burden of showing lack of undue influence, slight circumstances in addition thereto will impose that burden on him. That he called in his attorney to draw the probated will; that a few days after she had executed an earlier will and after consultation alone with him she decided, without independent advice, to take from natural objects of her bounty what she had given them by the earlier will and confer what she had thus taken away upon him with whom she had consulted alone, and that she was seriously ill with an ailment which caused her death two weeks later, are circumstances which in my opinion place the burden of proving lack of undue influence on such chief beneficiary. In re Ulrich, 98 N.J. Eq. 621; affirmed, 101 N.J. Eq. 825;In re Romaine, 113 N.J. Eq. 477; affirmed, 115 N.J. Eq. 172;In re Colton, 11 N.J. Mis. R. 410; affirmed, 115 N.J. Eq. 327. *Page 466 
Alexander at first testified that testatrix gave him no explanation for her change of mind as to these important provisions of her will and that he did not discuss the subject with her, although they did discuss other provisions of the will of June 25th, but he subsequently testified that she said Mrs. Bolles was able to take care of herself and that he asked her if she did not intend to do something for William Bolles, to which she replied that he was amply taken care of, was unmarried and had a good income, while he (Alexander) was married, had considerable obligations and decreased earnings and she thought it wiser to provide for Alexander than for Bolles. Explanation for the sudden change in Miss Smalley's attitude toward her sister and her nephew, William, depends wholly on the testimony of the man who benefits by changes made in a will wherein she had, two days previously, solemnly declared other intentions. If the reasons for substituting Alexander in place of Mrs. Bolles and her son were so important, it seems strange that they should have occurred to the mind of the testatrix only after Alexander had talked with her alone. After his conference with Miss Smalley alone, Alexander summoned the attorney again and was present throughout the entire conference between Miss Smalley and the attorney. He says he was there at Miss Smalley's request; that he suggested leaving, but she directed him to remain and gave no reason for requiring his presence, when, according to him, she had told him the previous day what she intended doing. The attorney testified that he did not like Alexander's presence while he was discussing the terms of the new will with Miss Smalley and that he suggested that Alexander leave, and it was then Alexander offered to go and Miss Smalley said for him to remain. The testimony of Alexander and the lawyer shows that Alexander participated in discussing the terms of the probated will, paragraph by paragraph, and I would remark that when the attorney was informed that it was proposed to eliminate the provisions theretofore made for Mrs. Bolles and her son and substitute Alexander in their stead, it was the attorney's duty to direct Alexander to leave the room so that he might talk freely with Miss Smalley and *Page 467 
learn whether she fully understood the changes proposed and that her mind was not subject to Alexander's domination. His attitude was not that of a careful lawyer serving a client in a matter in which his only interest was to give her proper counsel and advice. I find his testimony remarkable in that he does not say he questioned Miss Smalley as to her reason for disinheriting Mrs. Bolles and her son, or ask her what caused her change of mind from what he had written at her direction three days before. In fact all he had to say on this point was that Alexander asked her if she wanted to leave Mrs. Bolles anything (when Alexander knew the contrary from what he says she had told him the previous day) and she said, "it was all being provided for" and "Mrs. Bolles was able to take care of herself." The following day, June 29th, Alexander was not present and the attorney says Miss Smalley read the proposed new will carefully, paragraph by paragraph, and said she was satisfied with it before executing it, but he did not even then attempt to ascertain whether the preference she expressed by that will for Alexander over her sister and nephew was her own choice and whether she fully understood the effect of the changes she was making in her will of June 25th. If Alexander's influence over her was sufficiently strong on June 27th to induce her to disregard her previously declared testamentary intentions toward Mrs. Bolles and her son, I think his influence continued up to the time she executed the new will two days later and unless the attorney discussed with her in detail and at length the reason for the new will, she naturally would have told him she was satisfied with its terms. Alexander was concerned in ascertaining whether the terms of the new will were as he and she had agreed on, or whether her mind had been changed again, because he called on her two days after the execution of that will and examined it. Alexander was not only in a position, through his confidential relation with Miss Smalley, to control and direct her testamentary mind, but her physical condition at her age was such that she might not have been able to consider carefully suggestions he made to her. She had been under a physician's care since 1932 for a serious *Page 468 
heart ailment and when she executed her two wills in June she had been confined to her home for some time (if not to her bedroom floor), and she was so seriously ill from her disease that her physician believed her to be in imminent danger of death and she died thirteen days after executing the will of June 29th.
I conclude that the evidence and circumstances to which I have referred raise a presumption of undue influence exercised by Alexander over the testatrix which resulted in her execution of the probated will, and that such presumption has not been rebutted by the proponents of the will. The order of the orphans court refusing to set aside probate should be reversed. *Page 469